IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 31, 2002

## STATE OF TENNESSEE v. JOHN L. PHILLIPS, ET AL.

**Appeal from the Criminal Court for Davidson County**
**No. 3097     Steve R. Dozier, Judge**

---

**No. M2001-02396-COA-R3-CV - Filed November 6, 2003**

---

This appeal involves the forfeiture of two motorcycles and $15,910 seized by the District Attorney General for the Twentieth Judicial District as part of a proceeding to abate a motorcycle club as a nuisance. The owners of the club requested the Criminal Court for Davidson County to return the motorcycles and cash because they had not been used to maintain or conduct the motorcycle club. The trial court conducted a bench trial and ordered that the property be forfeited. The motorcycle club's owners have appealed. We have determined that the evidence supports the forfeiture order with regard to the two motorcycles and all but $680 of the cash.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Richard McGee and Jodie A. Bell, Nashville, Tennessee, for the appellants, John L. Phillips and Carolyn Phillips d/b/a Low Riders Club.

Paul G. Summers, Attorney General and Reporter, and Richard H. Dunavant, Assistant Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.

John Leslie Phillips, Jr. chartered the Low Riders Motorcycle Club as a not-for-profit corporation in 1995. The club was located on Clarksville Pike in Nashville on property owned by Mr. Phillips's spouse, Carolyn Phillips. While the club may have started out as a gathering place for persons with an interest in motorcycles, it soon turned into a for-profit nightclub selling beer, liquor, and food to its customers. Mr. Phillips began charging a cover charge, and the club provided its patrons with a bar, a poolroom, and a deejay.

Neighboring residents and businesses began to complain to the local police about the goings on at the club. They reported loud noises and disturbances at all hours of the night, blocked driveways, littering of beer bottles and cans, and traffic congestion. The police also received complaints of the unlicensed sale of beer and liquor, the sale of alcohol to minors, gambling, and illegal drug sales. Not surprisingly, the police began to take an interest in the club's activities.

The police visited the club on January 5, 2001. After determining that the club had no business license, beer permit, or license to sell alcoholic beverages, they confiscated 539 bottles and cans of beer and eight bottles of liquor.[1] Thereafter, the police conducted surveillance of the club's operation on January 12, 13, and 20, 2001. On each of these occasions, they observed men in black tee shirts stenciled with the word "Security" unload cases of beer and liquor from a white van and carry them into the club. On January 13, 2001, an undercover officer gained admission to the club and purchased two beers from a waitress and another three beers at the bar. He also observed other patrons buying mixed drinks at the bar. On January 20, 2001, the police seized another 655 bottles and cans of beer and 26 bottles of liquor and charged Mr. Phillips with selling and storing beer without a permit and storing alcoholic beverage without a license.

On February 15, 2001, the District Attorney General for the Twentieth Judicial District filed a petition in the Criminal Court for Davidson County to abate the Low Riders Motorcycle Club as a nuisance.[2] On February 16, 2001, the trial court entered an order padlocking the club and also issued search warrants for the club's premises, the Phillipses' residence, and J & R Market, another business operated by Mr. Phillips.

When the police searched the club's premises, they seized two Harley Davidson "low rider" motorcycles that were on display in the club's lobby and in the poolroom. They also seized $310 in cash, a price list for cocktails, and other documents. The search of the Phillipses' residence yielded $4,230 in cash located in a dresser drawer in one of the bedrooms, $11,000 in a metal box under a bed along with a small tray of marijuana, and $680 in a cigar box under another bed that also contained the receipts for lease payments on a Cadillac Escalade. The police also seized several loaded firearms and Mr. Phillips's Cadillac Escalade, as well as a notebook containing tabulations of the club's receipts on various dates. No money or property was seized at J & R Market.

On March 30, 2001, the Phillipses consented to a permanent injunction enjoining them from conducting a public nuisance at the Low Riders Motorcycle Club or anywhere else in Davidson County. The trial court ordered the Phillipses to raze the building because it had been partially destroyed by fire but permitted Mr. Phillips to operate his garage and wrecker business on the property. On April 17, 2001, the Phillipses petitioned the trial court to return the two motorcycles,

---

[1] By this time, Mr. Phillips had a history of liquor and beer law violations at the club. On September 1, 1998, the police recovered 33 bottles of liquor and 230 bottles and cans of beer. On November 30, 1998, Mr. Phillips was convicted of unlawfully storing beer and alcoholic beverages. On July 8, 2000, the police seized over 700 bottles and cans of beer at the club. On November 27, 2000, Mr. Phillips was convicted of selling beer and liquor without a license.

[2] Tenn. Code Ann. § 29-3-102 (2000) confers jurisdiction to abate public nuisances upon the chancery, circuit, and criminal courts and any court designated as an environmental court.

the Cadillac Escalade, and the $15,910 in cash seized at their residence. Following a hearing, the trial court determined that the Cadillac Escalade should be returned but that the cash and motorcycles should be forfeited. The Phillipses have appealed the forfeiture of the cash and motorcycles.

## II.
### THE STANDARD OF REVIEW

In Tennessee, forfeiture proceedings have historically been considered to be remedial civil actions. *State v. Vance*, No. 03C01-9601-CC-00026, 1996 WL 507 349, at *2 (Tenn. Crim. App. Sept. 9, 1996), *perm. app. denied* (Tenn. Apr. 13, 1998). They are creatures of statute, and the forfeiture statutes generally prescribe the government's standard of proof. Reflecting the civil nature of a forfeiture proceeding, these statutes generally require the government to prove its forfeiture claim by a preponderance of the evidence.[3] Because forfeiture proceedings are tried without a jury,[4] the standard for reviewing the trial court's factual findings is the standard associated with bench trials found in Tenn. R. App. P. 13(d).

The forfeiture proceedings incident to the abatement of a public nuisance, found in Tenn. Code Ann. §§ 29-3-101, -111 (2000 & Supp. 2003), are one hundred years old and are among the earliest statutory forfeiture proceedings still being enforced. Unlike forfeiture statutes of more recent vintage, the public nuisance statutes do not prescribe the government's burden of proof or the standard for reviewing a trial court's findings of fact in a forfeiture proceeding. However, the Tennessee Supreme Court has held that the proper standard of appellate review in cases of this sort is the preponderance of the evidence standard similar to that currently found in Tenn. R. App. P. 13(d). *Black v. State*, 130 Tenn. 529, 533, 172 S.W. 281, 282 (1914). Accordingly, in keeping with the essentially civil nature of a forfeiture proceeding brought under Tenn. Code Ann. § 29-3-101(c), we will review the trial court's findings of fact in this case using Tenn. R. App. P. 13(d).

Tenn. R. App. P. 13(d) requires reviewing courts to analyze the record de novo and to presume that the trial court's findings of fact are correct "unless the preponderance of the evidence is otherwise." If however, the trial court has not made a specific finding of fact on a particular matter, we will review the record to determine where the preponderance of the evidence lies without employing a presumption of correctness. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997). The presumption of correctness requires reviewing courts to defer to a trial court's findings of fact, *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000), and to give great weight to its findings of fact that rest on determinations of credibility. *In re Estate of Walton*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37 S.W.3d 462, 465 (Tenn. Ct. App. 2000).

A reviewing court employing Tenn. R. App. P. 13(d)'s standard of review should leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence establishes that a finding of fact other than the one found by the trial court is more probably true.

---

[3] *See, e.g.*, Tenn. Code Ann. §§ 53-11-201(d)(2), -451(b)(4) (1999) and Tenn. Code Ann. §§ 39-11-708(c), 40-33-210(a) (2003); *Lettner v. Plummer*, 559 S.W.2d 785, 787 (Tenn. 1977).

[4] *Helms v. Tennessee Dep't of Safety*, 987 S.W.2d 545, 549 (Tenn. 1999); *Jones v. Greene*, 946 S.W.2d 817, 825 (Tenn. Ct. App. 1996) (upholding the constitutionality of forfeiture procedures that did not provide a trial by jury).

*Parks Props. v. Maury County*, 70 S.W.3d 735, 742 (Tenn. Ct. App. 2001). Thus, for the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000). However, the evidentiary scales need only tip slightly against the trial court's findings to justify concluding that the evidence preponderates against them. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999).

The presumption of correctness in Tenn. R. App. P. 13(d) applies only to findings of fact, not to conclusions of law. Accordingly, appellate courts review a trial court's resolution of legal issues without a presumption of correctness and reach their own independent conclusions regarding these issues. *Johnson v. Johnson*, 37 S.W.3d 892, 894 (Tenn. 2001); *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 367 (Tenn. 1998); *Knox County Educ. Ass'n v. Knox County Bd. of Educ.*, 60 S.W.3d 65, 71 (Tenn. Ct. App. 2001); *Placencia v. Placencia*, 48 S.W.3d 732, 734 (Tenn. Ct. App. 2000).

Appellate courts review a trial court's finding of fact as a legal matter in one circumstance. When a finding of fact is based on undisputed evidence that can reasonably support only one conclusion, we will review that finding on appeal without Tenn. R. App. P. 13(d)'s presumption of correctness. *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d at 596; *Hamblen County Educ. Ass'n v. Hamblen County Bd. of Educ.*, 892 S.W.2d 428, 431 (Tenn. Ct. App. 1994); *Tennessee Farmers Mut. Ins. Co. v. American Mut. Liab. Ins. Co.*, 840 S.W.2d 933, 936 (Tenn. Ct. App. 1992).

## III.
### PROPERTY SUBJECT TO PUBLIC NUISANCE FORFEITURES

The public nuisance statutes describe the property subject to seizure and forfeiture in a proceeding to abate a public nuisance. Tenn. Code Ann. § 29-3-101(c) states that "[a]ll motor vehicles, furnishings, fixtures, equipment, moneys and stock, used in or in connection with the maintaining or conducting of a nuisance" are subject to seizure and forfeiture. Similarly, once the trial court determines that a public nuisance exists, Tenn. Code Ann. § 29-3-110 empowers the court to order the removal and sale of "all means, appliances, fixtures, appurtenances, materials, supplies, and instrumentalities used for the purpose of conducting, maintaining, or carrying on the unlawful business, occupation, game, practice or device." When read together, these two statutes authorize the seizure and forfeiture of personal property used to maintain, conduct, or carry on the activity found to be a public nuisance.

The scope of the forfeiture provisions of the public nuisance statutes is narrower than the scope of other forfeiture statutes in one material respect. The public nuisance statutes limit forfeitures to personal property used to maintain, conduct, or carry on a public nuisance. However, other forfeiture statutes permit the forfeiture of the proceeds acquired and accumulated as a result of criminal activities. *See e.g.*, Tenn. Code Ann. § 39-11-703(a) (2003); Tenn. Code Ann. § 53-11-451(a)(6)(A) (1999). The forfeiture provisions of the public nuisance statutes do not permit the forfeiture of proceeds from operating the public nuisance, unless these proceeds were used to maintain, conduct, or carry on the nuisance.

The Phillipses assert that the trial court used the wrong legal standard in this case. Relying on a fragment of one sentence in the forfeiture order, they insist that the trial court ordered the forfeiture of the cash, motorcycles, and Cadillac Escalade solely because it determined that they were proceeds from the operation of a public nuisance. While it is true that the trial court found that the State had "established . . . that the seized items with the exception of the automobile are proceeds from running this nuisance," this is not the only finding the trial court made. It also found that "the seized motorcycles were present on the premises and were being 'used in' conducting the nuisance" and, with regard to the cash found in the Phillipses' house, that "these funds are connected with the running of this nuisance."

A trial court's order and judgments should be construed like any other written instrument. *Gray v. Estate of Gray*, 993 S.W.2d 59, 63-64 (Tenn. Ct. App. 1998). Ascertaining the trial court's intention is the principal goal, and this intention should be gathered from all parts of the judgment. *Livingston v. Livingston*, 58 Tenn. App. 271, 281, 429 S.W.2d 452, 456 (1967). A judgment should be construed in light of the pleadings, *Vanatta v. Vanatta*, 701 S.W.2d 824, 826 (Tenn. Ct. App. 1985), and in such a way that "will give force and effect to every word of it, if possible, and make its several parts consistent, effective and reasonable." *Branch v. Branch*, 35 Tenn. App. 552, 556, 249 S.W.2d 581, 583 (1952).

The State's petition to abate the Low Riders Motorcycle Club as a public nuisance invoked Tenn. Code Ann. § 29-3-101(c) as the legal basis for the forfeiture of the Phillipses' cash and personal property. The State never invoked Tenn. Code Ann. § 39-11-703(a) as a basis for its forfeiture request, and therefore, we decline to read this ground into the State's petition at this stage of the proceeding. Despite the trial court's characterization of the seized property as "proceeds from running this nuisance," the fair and appropriate interpretation of its order is that it directed the forfeiture of the cash and motorcycles because it concluded that they were "used in" and "connected with" conducting the business that was ultimately found to be a public nuisance. These findings track Tenn. Code Ann. § 29-3-101(c), and accordingly, we conclude that the trial court did not base its forfeiture decision on the wrong legal grounds.

## IV.
### THE FORFEITURE OF THE MOTORCYCLES

The authorities seized two Harley Davidson "low rider" motorcycles at the club on February 17, 2001. One motorcycle was on display in the poolroom area and the other in club's main seating area where the booths were located. The Phillipses assert that these motorcycles were not subject to forfeiture because they were not "a prerequisite to the running of an illegal liquor establishment" and, therefore, were not "property used in the keeping or maintaining of the nuisance." The Phillipses have read Tenn. Code Ann. § 29-3-101(c) too narrowly.

This court was recently called upon to determine whether the forfeiture provisions in Tenn. Code Ann. §§ 29-3-101(c), -110 covered fixtures, furniture, and equipment that was not actually "used in creating the nuisance" at an adult entertainment club. In response to the club owners' objection to the seizure and forfeiture of all the fixtures located on their property, the Western Section held that the seizure and forfeiture of all furnishings, fixtures, and equipment used in or in

connection with the maintaining or conducting of a nuisance was lawful. Accordingly, the court upheld the seizure and forfeiture of all the personal property found in the adult club. *State ex rel. Woodall v. D & L Co.*, No. W1999-00925-COA-R3-CV, 2001 WL 524279, at *11 (Tenn. Ct. App. May 16, 2001), *perm. app. denied* (Tenn. Oct. 29, 2001).

We concur with the Western Section's interpretation of the reach of Tenn. Code Ann. §§ 29-3-101(c), -110. The two "low rider" motorcycles found in the Low Riders Motorcycle Club were clearly on display there to create the sort of ambiance that could attract patrons interested in motorcycles. Accordingly, they were "furnishings" being used to maintain and conduct an unlawful business and were, therefore, subject to immediate seizure and ultimate forfeiture.

## V.
### THE FORFEITURE OF THE CASH FOUND IN THE PHILLIPSES' HOUSE

The Phillipses also take issue with the trial court's conclusion that the $15,910 in cash found in their house was "connected with the running of this nuisance." They assert that the State failed to carry its burden of proof and that they presented convincing evidence that the source of the cash was not related to the operation of their club. We have determined that the evidence preponderates in favor of the trial court's conclusion that $15,230 of the cash found in the Phillipses' house was money used in maintaining or conducting the nuisance but that the evidence does not support that conclusion with regard to the remaining $680 found in the cigar box.

### A.

Litigants may prove any material fact by direct or circumstantial evidence or a combination of both direct and circumstantial evidence. *Browder v. Pettigrew*, 541 S.W.2d 402, 405 (Tenn. 1976); *Law v. Louisville & Nashville R.R.*, 179 Tenn. 687, 696, 170 S.W.2d 360, 363 (1943) (Chambliss, J., concurring); *Hollingsworth v. Queen Carpet, Inc.*, 827 S.W.2d 306, 309 (Tenn. Ct. App. 1991). Accordingly, in civil cases, litigants may carry their burden of proof using either direct or circumstantial evidence. *Bryan v. Ætna Life Ins. Co.*, 174 Tenn. 602, 610, 130 S.W.2d 85, 88 (1939); *Brown v. Daly*, 83 S.W.3d 153, 160 (Tenn. Ct. App. 2001); *Ætna Cas. & Sur. Co. v. Parton*, 609 S.W.2d 518, 520 (Tenn. Ct. App. 1980). In fact, litigants may prove their claim or defense entirely with circumstantial evidence because there are situations in which circumstantial evidence may be more convincing than direct evidence. *Estate of Brock ex rel. Yadon v. Rist*, 63 S.W.3d 729, 731 (Tenn. Ct. App. 2001).

Direct evidence is evidence which, if believed, establishes the main fact at issue without inference or presumption. *Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1227 (11th Cir. 2002); *Jackson v. State*, 576 S.E.2d 85, 86 (Ga. Ct. App. 2003); NEIL P. COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 4.01[5], at 4-10 (4th ed. 2000). Circumstantial evidence, on the other hand, requires "additional reasoning." 1 MCCORMICK ON EVIDENCE § 189, at 641-42 (John W. Strong ed., 5th ed. 1999). Circumstantial evidence is evidence of collateral facts and circumstances from which the trier-of-fact may infer that the main fact is based on reason and common experience. *Bishop v. State*, 199 Tenn. 428, 430, 287 S.W.2d 49, 50 (1956); *Johnson v. Ely*, 30 Tenn. App. 294, 299-300, 205 S.W.2d 759, 762 (1947) (circumstantial evidence consists of facts leading the mind to conclude

that another fact follows as a natural and probable consequence). If litigants undertake to support a claim or defense with circumstantial evidence, their proof must establish that their theory of the case is more probable than the other parties' theories. *Bryan v. Ætna Life Ins. Co.*, 174 Tenn. at 610, 130 S.W.2d at 88; *Benson v. H.G. Hill Stores, Inc.*, 699 S.W.2d 560, 563 (Tenn. Ct. App. 1985).

**B.**

The State has introduced sufficient circumstantial evidence to warrant the trial court's conclusion that, more probably than not, the $4,230 in cash found in the dresser drawer and the $11,000 in cash found in the metal box under the bed was used in the operation of the Low Riders Motorcycle Club. Six circumstances support this conclusion. First, Mr. Phillips admitted that he had "saved" this money from the operation of the club and the garage. While this admission is not direct evidence that he was using the money to operate the club, it established that most, if not all of the funds came from the illegal sale of beer and alcoholic beverages at the club.[5] This conclusion is buttressed by a second piece of circumstantial evidence. The police seized a notebook tabulating the club's revenues immediately before the State filed its nuisance action. The notebook established that the club had taken in at least $24,633 over thirteen days between December 2000 and February 2001. Based on these revenues, it is easy to conclude that the cash in the Phillipses' house represented part of the proceeds from the operation of the club immediately before it was padlocked.

Evidence that the cash found in the Phillipses' house was derived from the operation of the club does not necessarily establish that the cash was also used to operate the club. However, two other pieces of circumstantial evidence link the cash to the operation of the club. First, the operation of the club must have required large amounts of cash to purchase the beer and alcoholic beverages sold at the club. In light of the fact that these sales were illegal and that the Phillipses lacked the proper licenses to sell beer or alcoholic beverages at the club, they were required to obtain their beer and alcoholic beverages at retail which would have required large amounts of cash in light of the volume of their sales. Second, in light of the nature of the club's clientele, it is unlikely that the Phillipses would have kept large amounts of cash at the club. It was safer to keep the cash at home. Accordingly, these circumstances provide the trial court with sufficient evidence to conclude that the cash found in the Phillipses' house was to be used to purchase beer and alcoholic beverages to be sold illegally at the club or to pay other expenses associated with the club's operation.

Two other circumstances support the trial court's conclusion that $15,230 of the cash found in the Phillipses' house was going to be used to operate the club. First, the evidence demonstrates that the Phillipses' other two businesses were not generating significant revenue and were, in fact, losing money. Thus, it is unlikely that the seized cash could be traced to the operation of either the garage or the convenience market. The Phillipses even took an entirely different tack with regard to the source of the cash. They asserted that it represented the proceeds from the sale of property owned by Mr. Phillips's 93-year-old aunt and funds withdrawn from Ms. Phillips's profit-sharing account. The credibility to these explanations is undermined by the fact that (1) the aunt's property

---

[5] It is unlikely that any of the money came from the operation of the garage because the Phillipses' income tax returns indicate that the garage was operating at a loss.

had been sold five years earlier, (2) the Phillipses did not explain why they were storing the cash in their house, and (3) the Phillipses did not explain what the money was for.

## C.

We reach a different conclusion with regard to the $680 in cash found in the cigar box along with receipts for the lease payment for the Phillipses' Cadillac Escalade. While the circumstantial evidence may very well support the conclusion that this money came from the operation of the club, it does not establish that the Phillipses intended to use the money to operate the club.

Circumstantial evidence can cut both ways. The evidence in this case established that the lease payments for the Escalade were precisely $680 per month, that $680 in cash had been separated from the other cash found in the house, and that it had been placed in a box with the lease payment coupons for the Escalade. Accordingly, the $680 in the cigar box, more probably than not, was going to be used to make the next lease payment on the Cadillac Escalade. In light of the trial court's conclusion that the Escalade had not been used to operate or maintain the club, it necessarily follows that the funds for the Escalade's lease payment were likewise not going to be used to maintain or operate the club. Therefore, the evidence preponderates against the trial court's conclusion that the $680 found in the cigar box was money that was going to be used to operate the club.

## VI.

We affirm the judgment ordering the forfeiture of the two "low rider" motorcycles seized at the Low Riders Motorcycle Club and $15,230 of the $15,910 in cash seized at the Phillipses' house and reverse the judgment forfeiting the remaining $680 in cash. We remand the case to the trial court for further proceedings consistent with this opinion. We tax the costs in equal proportions to John Phillips and Carolyn Phillips and to the State of Tennessee.

_____
WILLIAM C. KOCH, JR., J.

-8-