Kristina WAIT

v.

**TRAVELERS INDEMNITY
COMPANY OF
ILLINOIS.**

Supreme Court of Tennessee,
at Nashville.

Oct. 3, 2007 Session.

Nov. 16, 2007.

Wade B. Cowan, Nashville, Tennessee, for the appellant, Kristina Wait.

Vanessa R. Comerford, Franklin, Tennessee, for the appellee, Travelers Indemnity Company of Illinois.

Terry L. Hill and Michael L. Haynie, Nashville, Tennessee, for the Amicus Curiae, Tennessee Chamber of Commerce & Industry, the Tennessee Self–Insurers Association, and the Tennessee Defense Lawyers Association.

## OPINION

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

This workers' compensation action presents an issue of first impression in Tennessee. The plaintiff sought workers' compensation benefits after a third party assaulted her while she was preparing lunch in her home where she had an employer-approved office. The chancery court granted the defendant's motion for summary judgment holding that the plaintiff's injuries did not arise out of or occur in the course of the plaintiff's employment. On appeal, the plaintiff argues that: 1) the injuries arose out of her employment because her work arrangement placed her in a position that facilitated the assault, and

2) the injuries occurred in the course of her employment because she was engaged in a permissible incidental activity. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel. Upon due consideration, we conclude that the plaintiff did suffer her injuries in the course of her employment. However, we affirm the chancery court's holding that the plaintiff's injuries did not arise out of her employment.

## I. FACTUAL BACKGROUND

From October 1998 until September 3, 2004, the plaintiff, Kristina Wait, worked as Senior Director of Health Initiative and Strategic Planning for the American Cancer Society ("ACS"). Because of the lack of office space at its Nashville, Tennessee facilities, the ACS allowed the plaintiff to work from her East Nashville home. The plaintiff converted a spare bedroom of her home into an office, and the ACS furnished the necessary office equipment, including a printer, a facsimile machine, a dedicated business telephone line, and a budget to purchase office supplies. In all respects, the plaintiff's home office functioned as her work place. Not only did the plaintiff perform her daily work for the ACS at her home office, the plaintiff's supervisor and co-workers attended meetings at the office in her house. There is no evidence in the record with respect to any designated hours or conditions of the plaintiff's employment, nature of her work space, or other work rules. Significantly, the plaintiff's work for the ACS did not require her to open her house to the public. In fact, during working hours the plaintiff locked the outside doors of her home and activated an alarm system for her protection. Unfortunately, however, on September 3, 2004, the plaintiff opened her door to a neighbor, Nathaniel Sawyers ("Sawyers"),

who brutally assaulted and severely injured the plaintiff.

The plaintiff met Sawyers in May or early June of 2004 at a neighborhood cookout she attended with her husband. Thereafter, Sawyers, who lived approximately one block from the plaintiff's home, came to the plaintiff's home for a short social visit on a *weekend* day in late June. The plaintiff and her husband spoke with Sawyers for approximately five minutes, and then Sawyers left. In August, Sawyers came to the plaintiff's home on a weekday for a social visit; however, the plaintiff was preparing to leave her home office for a job-related television interview. The plaintiff told Sawyers that she was going to a business meeting. When Sawyers replied that he was on his way to a job interview in Nashville, the plaintiff allowed Sawyers to ride with her to his job interview.

On September 3, 2004, the plaintiff was working alone at her home office. Around noon, the plaintiff was in her kitchen preparing her lunch when Sawyers knocked on her door. The plaintiff answered and invited Sawyers into the house, and he stayed for a short time and then left. However, a moment later, Sawyers returned, telling the plaintiff that he had left his keys in her kitchen. When the plaintiff turned away from the door, Sawyers followed her inside and brutally assaulted the plaintiff without provocation or explanation, beating the plaintiff until she lost consciousness. As a result of this assault, the plaintiff suffered severe injuries, including head trauma, a severed ear, several broken bones, stab wounds, strangulation injuries, and permanent nerve damage to the left side of her body.

On December 12, 2005, the plaintiff filed a complaint seeking workers' compensation benefits from Travelers Indemnity Company of Illinois, the insurer of the

ACS.[1] The plaintiff alleged that the she was entitled to workers' compensation benefits for the injuries she sustained in the assault because the assault arose out of and occurred in the course of her employment with the ACS. The defendant timely filed an answer denying that the injuries arose out of or occurred in the course of the plaintiff's employment.

Following discovery, the defendant filed a motion for summary judgment, which the chancery court granted. The chancery court concluded that the plaintiff's injuries did not arise out of or occur in the course of her employment with the ACS. Additionally, the chancery court noted that Sawyers "was not [at the plaintiff's home office] on any kind of business with the [ACS], nor was he really there on any kind of business with the [p]laintiff."

The plaintiff appealed. We accepted review before the case was heard or considered by the Special Workers' Compensation Appeals Panel.

## II. STANDARD OF REVIEW

■■■■ This case is before the Court to determine whether the chancery court erred in granting the defendant's motion for summary judgment. Rule 56 of the Tennessee Rules of Civil Procedure provides our standard of review when a workers' compensation claim is decided on a party's motion for summary judgment. *Downen v. Allstate Ins. Co.*, 811 S.W.2d 523, 524 (Tenn.1991). A motion for summary judgment should be granted when the moving party demonstrates that there are no genuine issues of material fact and

that he or she is entitled to judgment as a matter of law. *See* Tenn. R. Civ. P. 56.04; *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn.2000); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn.1993). The appellate court must review the evidence in a light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party. *Staples v. CBL & Assocs., Inc.*, 15 S.W.3d 83, 89 (Tenn.2000). The standard of review is de novo with no presumption of correctness attached to the trial court's conclusions. *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 337 (Tenn.2005).

The facts of this case are not in dispute.[2]

## III. ANALYSIS

### A. The Workers' Compensation Act and Telecommuting

■■■■ The Workers' Compensation Act ("Act"), codified at Tennessee Code Annotated sections 50–6–101 to –801 (2005), is a legislatively created quid pro quo system where an injured worker forfeits any potential common law rights for recovery against his or her employer in return for a system that provides compensation completely independent of any fault on the part of the employer. *See* Tenn.Code Ann. § 50–6–108(a) (2005); *Liberty Mut. Ins. Co. v. Stevenson*, 212 Tenn. 178, 368 S.W.2d 760, 762 (1963). The Act should be liberally construed in favor of compensation and any doubts should be resolved in the employee's favor. *Knox v. Batson*, 217 Tenn. 620, 399 S.W.2d 765, 772 (1966). However, this liberal construction require-

1. The plaintiff did not name the ACS as a defendant.

2. At oral argument before this Court, the plaintiff's counsel conceded that the facts are not in dispute, but maintained that "nuances" from the undisputed facts are in dispute. The record on appeal does not reflect that the

plaintiff's counsel relied upon these allegedly disputed "nuances" at the hearing before the Chancellor. Additionally, our review of the record convinces us that there are no disputes of material facts or "nuances" that preclude the entry of summary judgment.

ment does not authorize courts to amend, alter, or extend its provisions beyond its obvious meaning. *Middleton v. Allegheny Elec. Co.*, 897 S.W.2d 695, 698 (Tenn.1995). Finally, the Act is not a social welfare statute. *Bishop Baking Co. v. Forgey*, 538 S.W.2d 602, 604 (Tenn.1976).

This case requires us to apply the Act to a new and growing trend in the labor and employment market: telecommuting. An employee telecommutes when he or she takes advantage of electronic mail, internet, facsimile machines and other technological advancements to work from home or a place other than the traditional work site. *See* Brianne M. Sullenger, Comment, *Telecommuting: A Reasonable Accommodation Under the Americans With Disabilities Act As Technology Advances*, 19 Regent U.L.Rev. 537, 544 (2006–2007) ("Sullenger"). In 2006, approximately thirty-four million American workers telecommuted to some degree. *Id.*

Telecommuting is a flexible arrangement that affords many benefits not only to the employer and the employee, but also to the community. Employers often use telecommuting as a recruiting tool to attract new employees, and telecommuting has been credited with improving retention, productivity, loyalty, and morale. *Id.* at 546. Employers often use telecommuting as a way to reduce overhead expenses, such as office space rental. Similarly, employees enjoy many benefits of working at non-traditional work sites, such as reduced travel time and work-related stress, which results in increased time for family and personal activities. *Id.* at 546–47. Furthermore, society benefits from telecommuting with reductions in traffic congestion and pollution.[3] *Id.* at 547. Not surprisingly, however, this innovative working arrangement has resulted in an issue of first impression: whether the injuries a telecommuter sustains as a result of an assault at her home arise out of and occur in the course of her employment.

### B. Did the plaintiff's injuries occur in the course of her employment?

■ It is well settled in Tennessee, and in many other jurisdictions, that for an injury to be compensable under the Act, it must both "arise out of" and occur "in the course of" employment. Tenn.Code Ann. § 50–6–103(a) (2005); *Blankenship v. Am. Ordnance Sys., L.L.S.*, 164 S.W.3d 350, 354 (Tenn.2005); *Clark v. Nashville Mach. Elevator Co.*, 129 S.W.3d 42, 46–47 (Tenn. 2004). Although both of these statutory requirements seek to ensure a connection between the employment and the injuries for which benefits are being sought, they are not synonymous. *Blankenship*, 164 S.W.3d at 354 (citing *Sandlin v. Gentry*, 201 Tenn. 509, 300 S.W.2d 897, 901 (1957)). As such, the "arising out of" requirement refers to cause or origin; whereas, "in the course of" denotes the time, place, and circumstances of the injury. *Hill v. Eagle Bend Mfg., Inc.*, 942 S.W.2d 483, 487 (Tenn.1997). Furthermore, we have consistently abstained from adopting any particular judicial test, doctrine, formula, or label that purports to "clearly define the line between accidents and injuries which arise out of and in the course of employment [and] those which do not[.]" *Bell v. Kelso Oil Co.*, 597 S.W.2d 731, 734 (Tenn. 1980); *accord Hudson v. Thurston Motor Lines, Inc.*, 583 S.W.2d 597, 600 (Tenn. 1979).

---

**3.** According to Carol Browner, former administrator of the Environmental Protection Agency: "If 10% of the nation's workforce telecommuted one day a week, we would avoid the frustration of driving 24.4 million miles, breathe air with 12,963 tons less pollution, and conserve more than 1.2 million gallons of fuel each week." Julienne Bramesco, *Is Green the New Black?*, 25 No. 8 Ass'n Corp. Couns. Docket 74, 82 (2007).

In this case, we will consider the second requirement first. An injury occurs in the course of employment "when it takes place within the period of the employment, at a place where the employee reasonably may be, and while the employee is fulfilling work duties or engaged in doing something incidental thereto." *Blankenship,* 164 S.W.3d at 354 (quoting 1 Arthur Larson, *Workers' Compensation Law,* § 12 (2004)).

Generally, injuries sustained during personal breaks are compensable. *Holder v. Wilson Sporting Goods Co.,* 723 S.W.2d 104, 107 (Tenn.1987); *Gooden v. Coors Technical Ceramic Co.,* 236 S.W.3d 151, 155 (Tenn.2007). In *Holder,* we affirmed an award of workers' compensation benefits for an employee who slipped and fell in his employer's parking lot while he was putting his lunch box into his vehicle after finishing his meal. *Id.* at 105. We noted that "[t]he remedial policies of the Worker's Compensation Act would be undermined if too severe a line were drawn controlling the compensability of injuries that occur during the normal course of the work day after employees have arrived for work, have started working, and before they have left for the day." *Id.* at 107.

Much like the defendant in *Holder,* the defendant here argues that the plaintiff's injuries are not compensable because the plaintiff was not "fulfilling a work duty" in admitting Sawyers into her kitchen. It is true that the plaintiff suffered her injuries while preparing her lunch in the kitchen of her home; however, the plaintiff's work site was located within her home. Under these circumstances, the plaintiff's kitchen was comparable to the kitchens and break rooms that employers routinely provide at traditional work sites. Moreover, the ACS was aware of and implicitly approved of the plaintiff's work site. Her supervisor and co-workers had attended meetings at the plaintiff's home office. It is reasonable to conclude that the ACS realized that the plaintiff would take personal breaks during the course of her working day including "such incidental acts as eating, drinking, smoking, seeking toilet facilities, and seeking fresh air, coolness or warmth." *Carter v. Volunteer Apparel, Inc.,* 833 S.W.2d 492, 495 (Tenn.1992) (citing 1A Arthur Larson, *Workmen's Compensation Law,* §§ 21.10–21.50 (1990))(footnote omitted).

Thus, after careful review, we conclude that the injuries the plaintiff sustained while on her lunch break, like the injuries at issue in *Holder,* occurred during the course of the plaintiff's employment. The plaintiff was assaulted at a place where her employer could reasonably expect her to be. The ACS permitted the plaintiff to work from home for approximately four years. The plaintiff's supervisor and co-workers regularly came to her home office for meetings. The record does not suggest that the ACS restricted the plaintiff's activities during working hours or prohibited her from taking personal breaks. The facts do not show that the plaintiff was engaging in any prohibited conduct or was violating any company policy by preparing lunch in her kitchen. It is reasonable to conclude that the ACS would have anticipated that the plaintiff would take a lunch break at her home just as employees do at traditional work sites. *See McCormick v. Aabakus Inc.,* 101 S.W.3d 60, 63 (Tenn.Workers Comp.Panel 2000). Importantly, Sawyer's initial visit was very brief and spontaneous. Unless instructed otherwise by the employer, an employee working from a home office who answers a knock at her door and briefly admits an acquaintance into her home does not necessarily depart so far from her work duties so as to remove her from the course of her employment. This is not to say, however, that situations may never

arise where more prolonged or planned social visits might well remove the employee from the course of the employment.

In arguing that the plaintiff's injury did not occur "in the course of" her employment, the defendant maintains that the plaintiff's decision to admit Sawyers into her home was not a work duty. However, this argument misses the mark on this requirement because the Act does not explicitly state that the employee's actions must benefit the employer; it only requires that the injuries occur in "the course of" the employment. *See Carter,* 833 S.W.2d at 495–96. Because the plaintiff was engaged in a permissible personal break incidental to her employment, we reject the defendant's narrow interpretation of the Act. The question is not whether the plaintiff's injuries occurred while she was performing a duty owed to the ACS, but rather whether the time, place, and circumstances demonstrate that the injuries occurred while the plaintiff was engaged in an activity incidental to her employment. Accordingly, we hold that the plaintiff suffered her injuries during the course of her employment and disagree with the chancery court's conclusion on this important point.

### C. Did the plaintiff's injuries arise out of her employment?

 Even though the plaintiff's injuries occurred "in the course of" her employment, we nevertheless hold that they did not "arise out of" her job duties with the ACS. The phrase "arising out of" requires that a causal connection exist between the employment conditions and the resulting injury. *Travelers Ins. Co. v. Googe,* 217 Tenn. 272, 397 S.W.2d 368, 370 (1965). With respect to whether an assault arises out of employment, we have previously delineated assaults into three general classifications:

(1) assaults with an "inherent connection" to employment such as disputes over performance, pay or termination; (2) assaults stemming from "inherently private" disputes imported into the employment setting from the claimant's domestic or private life and not exacerbated by the employment; and (3) assaults resulting from a "neutral force" such as random assaults on employees by individuals outside the employment relationship.

*Woods v. Harry B. Woods Plumbing Co.,* 967 S.W.2d 768, 771 (Tenn.1998).

 When an assault has an "inherent connection" to the employment it is compensable. *See W.S. Dickey Mfg. Co. v. Moore,* 208 Tenn. 576, 347 S.W.2d 493 (1961) (finding injuries stemming from a job performance dispute arose out of the employment). On the other hand, assaults originating from "inherently private" disputes and imported into the work place are not compensable. *See White v. Whiteway Pharm., Inc.,* 210 Tenn. 449, 360 S.W.2d 12 (1962) (denying compensation where a third party murdered an employee on employer's premises over a domestic dispute). However, whether "neutral assaults" are compensable turns on the "facts and circumstances of the employment." *Woods,* 967 S.W.2d at 771; *see also Beck v. State,* 779 S.W.2d 367 (Tenn.1989) (finding a random assault by a third party arose out of employment where the employment exposed the claimant to public risks).

 The assault in this case is best described as a "neutral assault." In granting the defendant's motion for summary judgment, the chancery court commented: "[T]here's certainly not any evidence that this person who committed the assault was part of the working employment relationship and was not there on any kind of business related to the [ACS] or really any business with the employee." We agree

with the chancery court's conclusions. A "neutral force" assault is one that is "neither personal to the claimant nor distinctly associated with the employment." 1 Arthur Larson, *Workers' Compensation Law*, § 3.05 (2007); Arthur Larson, *The PositionalRisk Doctrine in Workers' Compensation*, 1973 Duke L.J. 761, 781 (noting that a neutral force is associated with neither the work environment nor the claimant's personal life). The *Woods* categories focus on what catalyst spurred the assault, i.e., was it a dispute arising from a work-related duty, was it a dispute arising from a personal matter, or was it unexplained or irrational? An assault that is spurred by neither a catalyst inherently connected to the employment nor stemming from an inherently private dispute is most aptly labeled as a "neutral force" assault. Here, the undisputed facts clearly show that the assault had neither an inherent connection with the employment, nor did it stem from a personal dispute between Sawyers and the plaintiff. Therefore, we must focus our attention on the facts and circumstances of the plaintiff's employment and its relationship to the injuries sustained by the plaintiff.

 Generally, for an injury to "arise out of" employment, it must emanate from a peculiar danger or risk inherent to the nature of the employment. *Blankenship*, 164 S.W.3d at 354. Thus, "an injury purely coincidental, or contemporaneous, or collateral, with the employment . . . will not cause the injury . . . to be considered as arising out of the employment." *Jackson v. Clark & Fay, Inc.*, 197 Tenn. 135, 270 S.W.2d 389, 390 (1954). However, in limited circumstances, where the employment involves "indiscriminate exposure to the general public," the "street risk" doctrine may supply the required causal connection between the employment and the injury. *Jesse v. Savings Prods.*,

772 S.W.2d 425, 427 (Tenn.1989); *see also Hudson*, 583 S.W.2d at 602 (adopting the "street risk" doctrine).

In *Hudson*, this Court adopted the "street risk" doctrine, which provides that "if the employment exposes the employee to the hazards of the street that it is a risk or danger incident to and inherent in the employment and provides the necessary causal connection between the employment and the injury." *Hudson*, 583 S.W.2d at 602. In that seminal case, unknown assailants assaulted the claimant as he entered the cab of his employer's tractor trailer after purchasing lunch at a fast food restaurant. *Id.* at 599. The assailants did not steal the claimant's money or anything from the vehicle, and their motives were never discovered. *Id.* In holding that the "street risk" doctrine supplied the causal connection, we emphasized that the claimant wore a uniform identifying him with his employer, the nature of the claimant's employment exposed him to the general public, and the claimant was charged with safeguarding his employer's property while on duty, even on his lunch break. *Id.* at 603.

In more recent cases, this Court has applied the "street risk" doctrine in situations that do not actually involve streets and highways. For example, in *Jesse*, 772 S.W.2d at 427, we applied the "street risk" doctrine to supply the causal connection where an employee was raped by a customer on her employer's premises while she was performing her work duties as a convenience store clerk. In that case, we rejected the employer's argument that "an employee so injured must show an employment-related motive on the part of the assailant and that a rape, standing alone, suggests a personal motive." *Id.* Rather, we held that an assailant's motive is but one factor to consider in deciding whether an assault arises out of the employment.

*Id.* The *Jesse* Court relied on the following rationale of *Hudson:* "the employee's visible identification with his employment and his responsibility as custodian of his employer's valuable property provided a sufficient nexus between the assault and the employment." *Id.* (citing *Hudson,* 583 S.W.2d at 603). The *Jesse* Court further stated that the street risk doctrine applies where an employee's "indiscriminate exposure to the general public is one of the conditions under which her work [is] required to be performed, and the actions of those persons on the premises are reasonably considered hazards of the employment." *Jesse,* 772 S.W.2d at 427.

Similarly, in *Beck v. State,* 779 S.W.2d 367 (Tenn.1989), we applied the substance of the doctrine to hold that a random assault upon a driver's license examiner, which occurred in her employer's parking lot, arose out of her employment, although we did not use the term "street risk." *Id.* at 371 (citing *Jesse,* 772 S.W.2d at 427). The assailant in *Beck* came to the claimant's place of employment and inquired: "Where is that mean old [claimant]?" *Id.* at 368. The assailant waited for the claimant who was administering a driving test. *Id.* at 368–69. When the claimant returned, she informed her co-workers of an improperly parked car. *Id.* at 369. The assailant admitted the car was his, but as the claimant turned away, he grabbed her tightly around the waist and whispered, "I want sex, sex, sex." *Id.* The claimant quickly pulled away from the assailant, but sought workers' compensation benefits based on the incident. *Id.* at 371. The *Beck* Court found that the claimant's emotional injuries were compensable and that they arose out of her employment, reasoning that the assailant had access to the claimant because her workplace was open to the public and because her job duties required her to ask the assailant to move his improperly parked vehicle. *Id.*

Likewise, in *Braden v. Sears, Roebuck & Co.,* 833 S.W.2d 496 (Tenn.1992), this Court held that the "street risk" doctrine satisfied the causal connection requirement where the employee was assaulted by unknown assailants as he removed paperwork from his employer's van while it was parked at his residence. *Id.* at 497–98. We carefully limited application of the street risk doctrine to "workers whose employment exposes them to the hazards of the street, or who are assaulted under circumstances that fairly suggest they were singled out for attack because of their association with their employer...." *Id.* at 499.

Unlike our previous cases in which the facts supported application of the "street risk" doctrine to provide the necessary causal connection, the facts here do not establish that the plaintiff's employment exposed her to a street hazard or that she was singled out for her association with her employer. There is nothing to indicate that she was targeted because of her association with her employer or that she was charged with safeguarding her employer's property. Additionally, the plaintiff was not advancing the interests of the ACS when she allowed Sawyers into her kitchen, and her employment with the ACS did not impose any duty upon the plaintiff to admit Sawyers to her home.

The plaintiff argues that had it not been for her employment arrangement, she would not have been at home to suffer these attacks. However, we have never held that any and every assault which occurs at the work site arises out of employment. Additionally, although Sawyers knew from a previous visit that the plaintiff was home during the day, there is nothing in the record which indicates that there was a causal connection between the plaintiff's employment and the assault.

Unlike our prior decisions, the facts do not show that Sawyers attacked the plaintiff because she was identifiable as an ACS employee, or because she was performing a job duty, or because she was safeguarding the ACS's property. The "street risk" doctrine is not a limitless means of allowing recovery for every situation. As such, this case presents us with an opportunity to outline the boundaries of the doctrine. When an employee suffers a "neutral assault" within the confines of her employer's premises—whether the premises be a home office or a corporate office-the "street risk" doctrine will not provide the required causal connection between the injury and the employment unless the proof fairly suggests either that the attacker singled out the employee because of his or her association with the employer or that the employment indiscriminately exposed the employee to dangers from the public. The facts of this case clearly illustrate that the "street risk" doctrine does not apply. There is nothing in the record to fairly suggest or provide any weight to the assertion that the plaintiff's injuries were causally connected with the nature of her employment. Therefore, the chancery court's holding that the plaintiff's injuries did not arise out of her employment is affirmed.

## IV. CONCLUSION

In sum, the plaintiff's injuries were suffered during the course of her employment; however, they did not arise out of her employment. The plaintiff was engaged in a permissible incidental activity at her sanctioned work site when she was viciously attacked. Under these narrow facts, this injury occurred in the course of the plaintiff's employment. However, the chancery court correctly found that the injuries did not arise out of the plaintiff's employment. We therefore affirm the judgment of the chancery court dismissing the complaint.

Costs of this appeal are taxed to the plaintiff, for which execution may issue if necessary.