# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 3, 2010 Session


## ANA R. PADILLA v. TWIN CITY FIRE INSURANCE COMPANY


**Appeal by Permission from the Special Workers' Compensation Appeals Panel
Chancery Court for Davidson County
No. 07-2647-III     Ellen Hobbs Lyle, Chancellor**

---

**No. M2008-02489-SC-WCM-WC - Filed October 6, 2010**

---

GARY R. WADE, J., dissenting.


I respectfully dissent. A basic principle of the Workers' Compensation Act ("the Act") is its remedial purpose. Tenn. Code Ann. § 50-6-116 (2008);[1] Trosper v. Armstrong Wood Prods., Inc., 273 S.W.3d 598, 609 n.5 (Tenn. 2008). For years, this Court has interpreted this statutory mandate to favor the employee under circumstances where there is "reasonable doubt" surrounding the compensability of a work-related claim. In my view, the claimant, in this instance, is entitled to the benefit of the doubt. Moreover, the "street risk doctrine," inaptly named, should serve as an alternative basis for the establishment of the causal relationship necessary to sustain the propriety of this claim.

This state's first workers' compensation laws were enacted in 1919. Lynch v. City of Jellico, 205 S.W.3d 384, 390 (Tenn. 2006); Scott v. Nashville Bridge Co., 223 S.W. 844, 846 (Tenn. 1920). A purpose of the Act was to provide a remedy for the injury or death of an employee against an employer without regard to negligence or fault. See Liberty Mut. Ins. Co. v. Stevenson, 368 S.W.2d 760, 762 (Tenn. 1963); Partee v. Memphis Concrete Pipe Co., 295 S.W. 68, 69 (Tenn. 1927). As stated in Wait v. Travelers Indemnity Co., 240 S.W.3d 220 (Tenn. 2007), the Act "is a legislatively created quid pro quo system where an injured worker forfeits any potential common law rights for recovery against his or her employer in return for a system that provides compensation completely independent of any fault on the part of the employer." Id. at 224 (citing Tenn. Code Ann. § 50-6-108(a) (2005)).

For an injury to be compensable under the Act, it must both arise out of and occur in the course of employment. See Tenn. Code Ann. § 50-6-102(12) (2008); Blankenship v. Am. Ordnance Sys., LLS, 164 S.W.3d 350, 353-54 (Tenn. 2005). As stated by the majority,

---

[1] "[T]his chapter is declared to be a remedial statute, which shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained."

however, these statutory requirements are not synonymous. See Sandlin v. Gentry, 300 S.W.2d 897, 901 (Tenn. 1957). Certainly, Jose Sanchez's death meets the second criteria – "in the course of" his employment – which refers to the "time, place, and circumstances." Crew v. First Source Furniture Grp., 259 S.W.3d 656, 664 (Tenn. 2008) (citing Hill v. Eagle Bend Mfg., Inc., 942 S.W.2d 483, 487 (Tenn. 1987)).[2] The question before us, therefore, is indeed whether the fatal attack on Sanchez arose out of his employment in the sense that his employment bore a causal relationship with his death.

When there is a causal connection between the conditions under which the work is required to be performed and the resulting injury, the injury arises out of the employment. Fritts v. Safety Nat'l. Cas. Corp., 163 S.W.3d 673, 678 (Tenn. 2005). While evidence of causation must not be speculative or conjectural, absolute "certainty is not required, and reasonable doubt must be resolved in favor of the employee." Glisson v. Mohon Int'l., Inc./Campbell Ray, 185 S.W.3d 348, 354 (Tenn. 2006) (citations omitted). Moreover, "the law does not distinguish between the probative value of direct evidence and the probative value of circumstantial evidence." Hindman v. Doe, 241 S.W.3d 464, 468 (Tenn. Ct. App. 2007). Whether direct or circumstantial, evidence can be equally relevant, Neil P. Cohen et al., Tennessee Law of Evidence § 4.01[5], at 4-11 (5th ed. 2005), and equally probative, McEwen v. Tenn. Dep't of Safety, 173 S.W.3d 815, 825 (Tenn. Ct. App. 2005) (citations omitted). Any material fact, of course, may be proven by using direct evidence, circumstantial evidence, or a combination of both. State v. Phillips, 138 S.W.3d 224, 230 (Tenn. Ct. App. 2003); Burton v. Warren Farmers Coop., 129 S.W.3d 513, 523 (Tenn. Ct. App. 2002).

---

[2] The general rule is that the injury is in the course of employment "'when it takes place within the period of the employment, at a place where the employee reasonably may be, and while the employee is fulfilling work duties or engaged in doing something incidental thereto.'" Blankenship, 164 S.W.3d at 354 (quoting 1 Larson's Workers' Compensation Law § 12 (2004)).

In Orman v. Williams Sonoma, Inc., 803 S.W.2d 672, 676 (Tenn. 1991), this Court made the following observation:

> The phrase "in the course of" refers to time, place, and circumstances, and "arising out of" refers to cause or origin. "[A]n injury by accident to an employee is in the course of employment if it occurred while he was performing a duty he was employed to do; and it is an injury arising out of employment if caused by a hazard incident to such employment." Generally, an injury arises out of and is in the course and scope of employment if it has a rational connection to the work and occurs while the employee is engaged in the duties of his employment.

Id. (citations omitted).

In the case before us, Sanchez, who had been employed for several years by Xelica LLC, a limited liability corporation owned by George Moolman, opened business operations each day as a part of his job responsibilities.[3] Xelica, a manufacturer of windows and doors for distribution to sales outlets, was located in a light industrial area in Nashville. Just before 5:30 a.m. on July 13, 2007, area residents heard gunshots but otherwise saw nothing unusual at the business premises. When Moolman arrived at 6:00 a.m., Sanchez was not at his work station, the machines were not in operation, and music, which was typically turned on by the time of his arrival, was not playing. Moolman then discovered Sanchez's body. There were two bullet wounds to the chest and two to the head. A police investigation established that there was some damage to the door. The lead detective, David Achord, testified that "[t]here was a scratch on the exterior side of the door, and then there was some damage to the door frame itself where the dead bolt would lock and the door latch would lock." Detective Brad Corcoran testified that there were two doors on site: a roll-up door and a walk-through door. He stated that "[t]he walk-through door had a bullet hole or two, as I recall, that was in it. It looked like it had been shot from the outside in." He also stated that "There was some type of damage to the lock, as I recall now. It was damaged almost like it was knocked off." On cross-examination, he expressed uncertainty about whether the bullets were shot through the outside or the inside of the door. He confirmed that the damage to the lock was on the inside. Nothing had been stolen from the business and Sanchez's personal effects remained undisturbed. The investigation further established that Sanchez had no criminal history. The police were unable to determine any motive for his murder. There was no indication that the assault was connected in any way to the private life of Jose Sanchez. Ultimately, no one was charged with any crime, and the investigation was transferred to the cold case unit of the Metropolitan Police.

There was circumstantial evidence at trial. There was proof that Xelica was located in a high-crime area. For example, a nearby business, which sold auto parts, had been burglarized on over twenty different occasions. As a precaution, the owner had secured a handgun permit, hired a security guard, and placed razor wire fencing around his property. Moreover, the police had investigated nine other forced entries, three unforced entries, and one murder in the area between 2005 and Sanchez's death in 2007. Xelica had been burglarized on two different occasions, both of which were "inside jobs" by employees who were later terminated. Moolman acknowledged that he had considered building a security fence as a means of added security. There was no suggestion that the murder was connected with either the fired employees at Xelica or those still on the payroll.

Twin City Fire Insurance Company, Xelica's workers' compensation insurance carrier, made three arguments: first, that the neighboring business that had been burglarized

---

[3] Whether that component of his job was at Sanchez's request or not is of no consequence, because the employer is obviously the final authority as to the duties of employment.

on several occasions was different, in that it was open to the public, while Xelica was exclusively a manufacturer; second, that Xelica's prior burglaries had been committed by its own employees; and third, that theft was an unlikely motive because nothing had been taken from the premises. While declining to grant a motion for directed verdict, the trial court ultimately agreed with Twin City's contentions, concluding that while the evidence did not connect the crime to Sanchez's private life, neither had it established that the motive for the murder was burglary, and, thus, the theory in support of recovery and the theory of the defense were equally plausible. Further, the trial court determined that the street risk doctrine, adopted in 1979 to "provid[e] the necessary causal connection between the employment and the injury" when "the employment exposes the employee to the hazards of the street," had no application under these circumstances. Hudson v. Thurston Motor Lines, Inc., 583 S.W.2d 597, 602 (Tenn. 1979).

Initially, I fear that the majority, by classifying this case as an assault resulting from a "neutral force" (or a random assault), has failed to give adequate consideration to the circumstantial evidence, largely unrefuted, presented in support of the claim for benefits, and in consequence, has neglected to give appropriate deference to the remedial nature of the Act. See Tenn. Code Ann. § 50-6-116. Language appearing in Martin v. Lear Corp., 90 S.W.3d 626 (Tenn. 2002), illustrates my concern:

> Tennessee Code Annotated section 50-6-116 declares the Workers' Compensation statute to be remedial in nature, and directs that the statute "shall be given an equitable construction by the courts, to the end that the objects and purposes of this chapter may be realized and attained." "Accordingly, 'these laws should be rationally but liberally construed to promote and adhere to the Act's purposes of securing benefits to those workers who fall within its coverage.'"

Id. at 629 (emphasis added) (citations omitted); see also Shubert v. Steelman, 377 S.W.2d 940, 943 (Tenn. 1964) (same).

This Court has consistently ruled that "any reasonable doubt as to whether an injury arose out of the employment is to be resolved in favor of the employee." E.g., Beck v. State, 779 S.W.2d 367, 371 (Tenn. 1989). Even when the assault has been classified as "neutral," this Court has traditionally applied this principle and granted recovery to the employee. For example, in Braden v. Sears, Roebuck & Co., 833 S.W.2d 496 (Tenn. 1992), the employee, a television technician who made house calls to Sears customers in a van furnished by the employer, parked the van in his driveway at the end of his workday. Id. at 497-98. While reviewing work documents in order to organize his schedule for the following day, the technician was assaulted and robbed of twenty dollars by an unknown assailant. Id. at 498. Despite the employee being "off the clock" and away from the business premises, this Court

-4-

sustained his workers' compensation claim, observing that the "arising out of" requirement is satisfied if an injury has a rational, causal connection to the work. Id. This Court confirmed the viability of the principle that "any reasonable doubt as to whether an injury arose out of the employment is to be resolved in favor of the employee." Id.; see also Beck, 779 S.W.2d at 377.

Further, Justice Frank Drowota, writing for the Court in Braden, concluded that "while we approve of the street risk doctrine as an aid to evaluate the causal relationship between certain injuries and employment, we caution that 'each case must be decided with respect to its own attendant circumstances and not by resort to some formula.'" 833 S.W.3d at 499 (emphasis added) (quoting Bell v. Kelso Oil Co., 597 S.W.2d 731, 734 (Tenn. 1980)). Even though the Court applied the street risk doctrine in Braden, the quoted language, I believe, also stands for the proposition that the doctrine need not be invoked when the circumstances of the case establish, even if marginally so, a causal connection between the assault and the employment.

Finally, unlike the majority, I view the street risk doctrine as either an augmentation of the basic claim or an alternative basis for recovery under these facts. As an initial matter, the street risk doctrine may be applied to injuries which occur at the place of employment as well as those on the "streets." See Hurst v. Labor Ready, 197 S.W.3d 756 (Tenn. 2006); Jesse v. Savings Prods., 772 S.W.2d 425 (Tenn. 1989). Further, the fact that Xelica did not engage in retail sales is not a valid reason to refuse application of the street risk doctrine to these circumstances. While explaining the nature of the street risk doctrine, this Court in Hurst observed that "workers whose employment exposes them to the hazards of the street, or who are assaulted under circumstances that fairly suggest they were singled out for attack because of their association with their employer, are entitled to establish this causal connection with the aid of the street risk doctrine." 197 S.W.3d at 761 (quoting Braden, 833 S.W.2d at 499). In Hurst, while the employee waited outside his employer's building to be paid, a manager refused to allow a passerby into the building to use a restroom in accordance with company policy. 197 S.W.3d at 758-59. A dispute ensued, and the employee was shot and killed. This Court concluded that Hurst was "singled out for attack because of [his] association" with his employer due to the fact that he was readily identifiable as an employee and the shooting "stemmed from" Labor Ready's enforcement of its own policies. Id. at 761-62.

The case before us presents an even stronger claim than that in Hurst. When an employee, who is authorized to open business operations in a location particularly vulnerable to criminal activity, is shot and killed by an assailant who had gained entry into the premises by means unknown, surely his family is entitled to benefits. Under circumstances such as these, an employee should expect workers' compensation coverage.

In summary, I believe that the circumstantial evidence in this instance is sufficient for this Court to resolve "reasonable doubt" as to causation favorably to the employee. The remedial nature of the statute would justify that. Further, the street risk doctrine, in my view, provides either an "aid" justifying the claim or an alternate basis for recovery. In Larson's Workers' Compensation, the author addresses occasions when an assault occurs for which there is no explanation or cause, and "even with all the facts available, no one can figure out why the assault was committed. Nothing connects it with the victim privately; neither can it be shown to have had a specific employment origin." 1 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation, Desk Edition § 8.03[3], at 8-44 (2008). This treatise suggests the following remedy:

> If the claimant is in fact exposed to that assault because he or she is discharging employment duties at that time and place, there is no better reason here than in the unexplained-fall or death cases to deny an award merely because claimant cannot positively show that the assault was motivated by something connected with the work. Although the cases are more evenly divided on unexplained assaults than on unexplained falls or deaths, there is now a demonstrably larger body of authority for awarding compensation on these facts than for denying it.

Id. (emphasis added). By the ruling today, this Court appears to have adopted the minority view among the states that have considered the issue. Finally, as to the street risk doctrine, the following language addresses the three kinds of risks identified in the majority opinion, but offers a more preferable result:

> There are thus three categories of risk; but unfortunately, there are only two places where the loss may fall – on the industry or on the employee. And so the question becomes, which bears the burden of this in-between category of harms?
>
> . . . [T]he usual answer in the past has been to leave this loss on the employee, on the theory that he or she must meet the burden of proof of establishing affirmatively a clear causal connection between the conditions under which the employee worked and the occurrence of the injury. More recently, however, some courts have reasoned in the following vein: Either the employer or the employee must bear the loss; to show connection with the employment, there is at least the fact that the injury occurred while the employee was working; to show connection with the employee personally there is nothing; therefore, although the work connection is slender, it is at least stronger than any connection with the claimant's personal life.

<u>Id.</u> § 4.03, at 4-3 (emphasis added). I agree with this assessment. While the connection between the death of Sanchez and his work perhaps qualifies as slender, surely the evidence creates "reasonable doubt" as to cause, because there was no connection whatsoever to his personal life.

For all of these reasons, I must respectfully dissent from the opinion of the majority.

_____
GARY R. WADE, JUSTICE