# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### AUGUST 4, 2009 Session

## DALTON REB HUGHES and wife, SANDRA HINES HUGHES v. METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, TENNESSEE

### Direct Appeal from the Circuit Court for Davidson County
No. 04C-2406     Thomas W. Brothers, Judge

### No. M2008-02060-COA-R3-CV - Filed February 4, 2010

A Metro public works employee was injured when a front end loader operated by a Metro fire department employee made a loud noise, causing the public works employee, fearing for his life, to fall while attempting to jump over a guardrail. The injured plaintiff filed suit against Metro and the defendant front end loader operator. Metro filed a cross-claim against the defendant as well as a counter-claim against the plaintiff seeking a subrogation of lost wages and medical payments recovered from the defendant. The trial court found that the defendant acted negligently and within the scope of his employment, and thus, it found that Metro's immunity was removed pursuant to the Governmental Tort Liability Act. Accordingly, the trial court entered a judgment for the plaintiff against Metro, and it dismissed the claims against the defendant. On appeal, Metro argues that the defendant acted intentionally, rather than negligently, and that his conduct was outside the scope of his employment, such that Metro retains its immunity. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J., W.S.,, delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Kevin C. Klein, Andrew D. McClanahan, Nashville, Tennessee, for the appellant, Metropolitan Government of Nashville and Davidson County, Tennessee

Joe M. Haynes, Goodlettsville, Tennessee, for the appellee, Dalton Reb Hughes

Irene R. Haude, Nashville, Tennessee, for the appellee, Frank Archey

## OPINION

## I. FACTS & PROCEDURAL HISTORY

Dalton Reb Hughes is employed by the Metropolitan Government of Nashville ("Metro") Fire Department, and Frank Archey is employed by Metro's Public Works Department. By 2003, Mr. Archey had been operating heavy equipment for approximately twenty-five years, and a front end loader for fifteen years. He claims that other than the incident involved in this case, he has never injured anyone while operating heavy equipment.

Apparently, the public works department had been operating from a Charlotte Avenue location (the "Facility") for some time, but the fire department moved to the Facility shortly prior to October of 2003. On October 13, 2003, Mr. Archey was operating a front end loader in north Nashville. At the end of the day, he returned the front end loader to the Facility to park it for the evening. According to Mr. Archey, he stopped the front end loader on Charlotte Avenue to allow oncoming traffic to pass. He then turned left onto the access roadway, and proceeded seventy yards to a gate. Mr. Archey claims that after turning from Charlotte Avenue, the access roadway inclines, then it is "pretty flat for a while[,]" and then it "declines gradually." Mr. Archey states that he was traveling "wide open" in first gear at approximately six to eight miles per hour[1] and that he was "revving it up pretty good." Mr. Archey saw two pedestrians walking on the right side of the access roadway along a guardrail, and therefore, he claims he tried to move the front end loader to the left side of the access roadway and that he slowed to four to six miles per hour. Despite having the front end loader's bucket set "down to bottom-out status" so that it would not bounce, as Mr. Archey came through the gate, he hit a dip–or a repatched pothole–which caused the bucket of the front end loader to "bottom out"–to drop to the ground, to bounce up, and then hit the ground again.[2] Mr. Archey claims to have seen other vehicles bounce at this location.

According to Mr. Archey, before he "bottomed out," he saw someone "go over the guardrail" thirty to thirty-five yards away. Subsequently, Mr. Archey discovered that the man who had gone over the guardrail was Mr. Hughes. Mr. Archey then stuck his head out of the front end loader cab and asked if Mr. Hughes was okay. He maintains that he did not state that he was "just messing" with Mr. Hughes. After stopping the front end loader seven to eight feet from the guardrail, Mr. Archey claims he again asked Mr. Hughes if he was okay, and he stated to Mr. Hughes that he did not mean to scare him. A few days after the

---

[1] The speed limit on the access road was posted at ten miles per hour.

[2] Mr. Archey could not recall whether the front end loader's bucket hit the ground two or three times.

incident, Mr. Archey spoke with Tommy Goad, the pedestrian walking alongside Mr. Hughes when the incident occurred, and he claims he told him that he did not intend to scare him. Mr. Archey maintains that he was not "horseplaying" and that he never intended to hurt or scare anyone.

At the time of the October 2003 incident, Mr. Archey had been working out of the Facility for approximately twelve years, and had driven "this path" thousands of times. However, since the fire department had moved to the Facility, the guardrail had been added, and the route typically traveled by Mr. Archey had changed; he had only been going through the gate for approximately two to three weeks at the time of the incident. Mr. Archey claims that when he saw two pedestrians walking along the right side of the access roadway, he moved into the left lane, in which he had never driven before, to avoid hitting them. However, he also states that two bounce marks were left on the middle and right side of the road because he was trying to avoid two to three people seventy-two to eighty yards away in the left lane.[3]

Mr. Hughes recalls the incident differently. Mr. Hughes claims that while he was walking "right up against the guardrail" on the right side of the access road, with Mr. Goad to his left and Charlotte Avenue to his back, he heard a "loud noise" which caused him to turn around to see "a front end loader coming at a high rate of speed." He maintains that he turned back around to get out of the way when he heard the "loud, steady [scraping] noise" of the front end loader's bucket dropping. Mr. Hughes "thought [Mr. Archey] was almost fixing to run over us. . . . [s]o [he] tried to get over th[e] guardrail any way that [he] could to try to get away from him." However, in his attempt to jump over the guardrail, Mr. Hughes' knees hit the top of the guardrail "and it kind of somersaulted [him] down to where [he] hit on [his] elbows flat on the pavement real hard because [he] was trying to get out of the way quick." Following the incident, Mr. Hughes had surgery on both knees and both shoulders.

According to Mr. Hughes, while he was lying on the ground, he looked up and saw Mr. Archey sitting on the front end loader "with a big grin on his face." Mr. Hughes immediately said "damn it, Frank [Archey,]" and Mr. Archey started getting off of the front end loader apologizing and stating that he only meant to scare Mr. Hughes. While Mr. Archey's comments made Mr. Hughes believe that Mr. Archey was trying to play a joke on him, Mr. Hughes admits that Mr. Archey may have said "I didn't mean to scare you" immediately after the incident.

---

[3] The record contains a photograph which Mr. Archey contends depicts short marks consistent with bouncing. However, the alleged marks have been "highlighted" with an ink pen, and thus, no original marks are visible.

Mr. Hughes describes Mr. Archey as an "acquaintance." Mr. Archey's mother babysat Mr. Hughes' children, Mr. Hughes rented a home from Mr. Archey's aunt, and Mr. Hughes and Mr. Archey "scouted" together "a couple of times" twenty-five to thirty years prior. However, Mr. Hughes insists that he had had no contact with Mr. Archey in approximately twenty-five years prior to the incident. Because of the fire department's recent move, Mr. Hughes had been working at the Facility for only two days at the time of the incident, and Mr. Archey claims that he did not know of Mr. Hughes' transfer to the Facility until after the incident had occurred.

Mr. Goad, the fire department employee with whom Mr. Hughes was walking when the incident occurred, states that when he heard a noise that "sounded kind of like an engine[,]" he "didn't think a whole lot about it[.]" However, "all of a sudden, it was a different kind of sound, like something hit pavement, or something touched concrete or pavement of something." He stated that the sound was not like a "quick bounce" but was a dragging sound which "was on the pavement and stayed on the pavement. It stayed on it. It never did let up." After hearing the second sound, Mr. Goad looked to his left, but did not see anything. When he turned back around he no longer saw Mr. Hughes. He looked over the guardrail and heard Mr. Hughes, who was lying on the ground, state that he "thought [he] was going to get run over[.]" Mr. Goad claims that immediately after the incident, he heard Mr. Archey ask Mr. Hughes if he was okay and then state that he "didn't mean for you to get hurt[,]" that he "was just trying to scare you." Some time later, "at the shop," Mr. Goad again heard Mr. Archey state that he "was just trying to scare you all and [he] didn't mean for nobody to get hurt or nothing like that."[4]

Mr. Goad states that he normally traveled on the access road each evening to retrieve his vehicle from the employee parking lot. He claims that he has never had a problem walking that path before, and that he was used to hearing engine noises of vehicles coming by to refuel. Although he admits that the second sound was "different," it did not cause him to be afraid or to alter his walking path. However, he points out that he did not see the front end loader before Mr. Hughes went over the guardrail, and that if he had, he may have acted differently.

Immediately after the incident, Mr. Goad recalls looking back at the front end loader and noticing that it was not pointed straight down the access road, but instead, that it was angled towards, and only one to two feet from, where he and Mr. Hughes had been walking. He insists that no other vehicles were approaching, and thus, that Mr. Archey had no reason

---

[4] Mr. Goad admitted that in his 2006 deposition he stated that after the date of the incident he had not heard Archey again mention the incident. However, he stated that his recollection regarding the second statement had been refreshed.

to angle the front end loader towards them.

Metro fire department employee Darrell Pulley was standing with his back to the access road when the incident occurred. He claims that he heard a "engine revving up" which caused him to turn around. He saw the front end loader's bucket drop and drag "for an estimated twelve to twenty feet" and then stop "within inches" of where Mr. Hughes had been standing. He maintains that when the bucket dropped, there was a continual scrape across the ground, and that what he saw was not consistent with someone "bottoming out" coming through the gate. Although he admits that a grade change may exist at the gate, Mr. Pulley insists that there was no pothole on the date of the incident, and that he had never seen patched or working potholes in the gate area. Additionally, he maintains that the access road is wide enough to allow for both pedestrians and a front end loader.

After Mr. Archey stopped the front end loader, but while he was still sitting on it, Mr. Pulley claims that Mr. Archey "kind of chuckled and laughed and said I wasn't trying to hurt you, I was just trying to scare you." He maintains that Mr. Archey "said the same thing" while Mr. Pulley was helping Mr. Hughes to his car. Finally, Mr. Pulley alleges that approximately one week after the incident, while he was at the maintenance shop, he again heard Mr. Archey state that he "wouldn't hurt [Mr. Hughes] for anything in the world. . . . [that he] was just trying to scare him. Scare you all."

Pat Armstrong, another Metro fire department employee, like Mr. Pulley, recalls hearing a continuous scrape noise coming from the front end loader. He also heard Mr. Archey state "look, [Mr. Hughes], I was just joking. I didn't mean to do that. I was just trying to scare you all." Approximately one week after the incident, Mr. Armstrong again heard Mr. Archey say that he was trying to scare Mr. Hughes and that he did not intend to harm anyone. He claims he never heard Mr. Archey say that he "bottomed out" on a dip in the road.

However, Metro public works employee John David Pope remembers hearing one quick noise at the time of the incident. He maintains that there is "like a little dip" when you come through the gate which causes a "kind of bounce a little bit[.]" Mr. Pope has operated a front end loader through the gate, and although he has "[k]ind of jarred [the front end loader] a little bit," he has never made a noise going through that area.

Following the incident, Mr. Hughes filed a complaint against Metro and Mr. Archey, asserting the negligence of both, on August 19, 2004. He later amended his complaint to allege that Mr. Archey committed an intentional act by operating the equipment for the purpose of causing Mr. Hughes "to believe it was a run away piece of equipment." Metro filed a cross-claim against Mr. Archey seeking both a judgment against him for any loss

Metro suffers and to recover lost wages and medical expenses paid by Metro. Metro also filed a counter-claim against Mr. Hughes seeking a subrogation of lost wages and medical payments recovered from Mr. Archey, and claiming a set-off for lost wages and medical payments paid by Metro if comparative fault was apportioned to Mr. Hughes.

Following a trial, the trial court entered an order of August 22, 2008, which states, in part:

> [T]he Court finds that [Mr. Hughes] failed to prove negligent supervision,[5] that this is not an intentional tort, and that Frank Archey was negligent while he was acting within the scope of his employment for Defendant Metro[]. The Court finds that the Plaintiff, Dalton Reb Hughes, is entitled to recover from the Defendant, Metro[] the amount of . . . $250,000.00 . . . for the damages he suffered. The Court further finds that [Mr. Hughes] was not guilty of any comparative fault.
>
> Mr. Archey was an employee of the Metropolitan Government on October 17, 2003, and was acting within the course and scope of his employment in his operation of the front loader. Furthermore, the Court finds that Mr. Archey owed a duty of ordinary care to those around him, particularly the pedestrians who Mr. Archey knew were in the front loader's path. The Court also finds that Mr. Archey breached that duty of care, and furthermore, that it was foreseeable that this breach would result in injury to the pedestrians, including Mr. Hughes. Finally, the Court finds that Mr. Archey's actions were the cause-in-fact and the legal cause of Mr. Hughes' injuries. Accordingly, the court enters judgment in favor of Mr. Hughes on his direct negligence claim against the Metropolitan Government.
>
> The Court finds that Mr. Archey's actions constitute negligence, not an intentional tort. The Court notes that this incident occurred on a Friday afternoon at the end of the work day. Mr. Archey was aware that there were pedestrians walking on the right side of the road on which he was driving; however, he did not pull the front loader over to the left side of the roadway, even though he clearly had room to do so. Furthermore, Mr. Archey was aware that there was a dip in the roadway, but he approached this dip without slowing down. The Court finds that under these circumstances, at the rate of speed Mr. Archey was traveling, it was foreseeable to him that the front loader would bounce as it traveled over the dip, which would cause the bucket to hit

---

[5] This finding is not challenged on appeal.

the pavement, which would make a very loud noise. It was foreseeable that the pedestrians would be startled. Mr. Archey did not intend to cause harm to Plaintiff or any other person.

With respect to whether Mr. Archey's actions were negligent or intentional, the Court finds that Mr. Archey intentionally revved up the motor on the front loader and bounced it over the dip in the roadway to make a loud noise. In layman's terms, Mr. Archey was "cutting up" on a Friday afternoon. Furthermore, while the proof does not show that Mr. Archey intentionally took the controls and dropped the bucket on the front loader, the Court finds that Mr. Archey did intend to carelessly drive the front loader over the dip to make the noise and commotion associated with it. However, the Court holds that driving the vehicle in a careless manner does not equate to an intentional tort as envisioned by the Government[al] Tort Liability Act.

The Court finds that because this is a case of negligence arising out of Mr. Archey's operation of equipment, T.C.A. § 29-20-202 of the Government[al] Tort Liability Act applies, and the Metropolitan Government's immunity is removed. Because the Metropolitan Government's immunity is removed, the Court finds that Mr. Archey is immune from suit. Therefore, Mr. Hughes' claim against Mr. Archey is dismissed with prejudice, and the Metropolitan Government's Cross-Claim against Mr. Archey is dismissed with prejudice.

[T]he Court finds that Mr. Hughes has incurred damages and injuries that would exceed the $250,000 cap imposed by the Governmental Tort Liability Act. Therefore, the Court awards Mr. Hughes $250,000 in damages for []his pain and suffering, loss of enjoyment of life, loss of earning capacity, and medical expenses. However, the Court finds that the Metropolitan Government is entitled to a set-off in the amount of $104,658.57 for the medical expenses and lost wages that it has already paid as a result of the October 17, 2003 incident.

From this order, Metro appeals.

## II.  ISSUES PRESENTED

Metro has timely filed its notice of appeal and presents the following issues for review, summarized as follows:

1.      Whether the Circuit Court erred in holding that Tenn. Code Ann. § 29-20-202 removes governmental immunity for injuries arising out of *any* operation of a motor vehicle or other equipment by a governmental employee, as opposed to removing immunity only for injuries arising out of a governmental employee's *negligent* operation of a motor vehicle or other equipment;

2.      Whether the Circuit Court erred in holding that Frank Archey, an employee of the Metropolitan Government, acted negligently, as opposed to intentionally; and

3.      Whether the Circuit Court erred in holding that Frank Archey was acting within the scope of his employment.

For the following reasons, we find that the trial court erred in holding that Tennessee Code Annotated section 29-20-202 does not require negligent conduct. However, we affirm the trial court's judgment for Mr. Hughes against Metro, and its dismissal of Mr. Hughes' and Metro's claims against Mr. Archey.

## III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d) (2008); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001).  For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.  *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).  When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies.  *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)).  We accord great deference to a trial court's determinations on matters of witness credibility and will not re-evaluate such determinations absent clear and convincing evidence to the contrary.  *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999) (citations omitted).  We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness.  *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788

S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A. General Law of Governmental Liability

The Tennessee General Assembly, in 1973, enacted the Governmental Tort Liability Act ("GTLA"), "which partially waived immunities previously afforded to the government under common law." *Pendleton v. Metro. Gov't of Nashville and Davidson County*, No. M2004-01910-COA-R3-CV, 2005 WL 2138240, at *2 (Tenn. Ct. App. Sept. 1, 2005) (citing 1973 Tenn. Pub. Acts ch. 345, *codified at* Tenn. Code Ann. § 29-20-101 *et seq.* (2005)). "The general rule of governmental immunity from lawsuits is set forth in Tennessee Code Annotated § 29-20-201." *Ford v. New Greater Hyde Park Missionary Baptist Church of Memphis*, Nos. W2006-02614-COA-R9-CV, W2006-02615-COA-R9-CV, W2006-02616-COA-R9-CV, 2007 WL 4355490, at *5 (Tenn. Ct. App. Dec. 12, 2007). There are, however, four exceptions to this general rule enumerated in Tennessee Code Annotated sections 29-20-202 through -205. *Id.* Specifically, at issue in this appeal, are sections 202 and 205. Tennessee Code Annotated section 29-20-202 removes governmental immunity "for injuries resulting from the negligent operation by an employee of a motor vehicle or other equipment while in the scope of employment." Tennessee Code Annotated section 29-20-205 removes governmental immunity "for injury proximately caused by a negligent act or omission of any employee within the scope of his employment[.]" There is a list of exceptions to this exception; specifically, Tennessee Code Annotated section 29-20-205(2), often referred to as the "intentional tort exception," preserves governmental immunity for claims arising out of "false imprisonment pursuant to mittimus from a court, false arrest, malicious prosecution, intentional trespass, abuse of process, libel, slander, deceit, interference with contract rights, infliction of mental anguish, invasion of right of privacy, or civil rights[.]"

On appeal, Metro argues that the trial court erred in finding that Mr. Archey was acting within the scope of his employment during the incident, and in finding that his actions constituted negligent rather than intentional conduct. We address each finding below.

### B. Course and Scope of Employment

Both Tennessee Code Annotated section 29-20-202 and section 29-20-205 remove the government's immunity only where the governmental employee was acting within the scope of his or her employment. The trial court, in its order, specifically found that Mr. Archey "was acting within the course and scope of his employment in his operation of the front

loader." However, Metro maintains that Mr. Archey's "horseplay" was outside the scope of his employment, and therefore Metro retains its immunity.

Metro cites several cases in support of its argument that Mr. Archey was acting outside the scope of his employment when Mr. Hughes was injured. First, Metro cites *Terrett v. Wray*, 105 S.W.2d 93, 93 (Tenn. 1937), wherein the defendant mother sent her "schoolboy" son to the schoolhouse to pick up other children. The defendant's son "rigged up a wire connecting one of the handles of the door of the car to a battery, so that one, by grasping the handle of the door, would receive an electric shock." *Id.* Terrett was injured when he took hold of the handle, and suit was filed against the defendant mother on his behalf. *Id.* Our Supreme Court, in finding that the defendant's son was not acting within the scope of his employment, stated:

> The act of the servant, to make the master liable, must be within the course of the employment when he is doing for the master, either the main act itself or some other act which can fairly and reasonably be deemed a proper means of doing the main act, or an ordinary and natural incident or a natural, direct, and logical result of it. Extraordinary, extreme, or prankish acts rarely can be attributable to the master as means or methods of carrying out an ordinary employment. There must be negligence of the servant within the course of employment and not aside from it to make the master liable. . . .

*Id.* In *Terrett*, the Court found that the mother did not authorize the boy to use the car for any purpose other than delivering the children, and that his actions in electrifying the door handle "had no connection with his authorized and direct use of the car, but was the distinct tort of the son[.]" *Id.* at 95. Furthermore, the *Terrett* Court cited with approval the New Jersey Supreme Court of Errors and Appeals[6] opinion of *Evers v. Krouse*, 58 A. 181, 182 (N.J. 1904), in which the New Jersey court found that a child, who was directed by his father to use a garden hose to water the lawn but instead, "in the spirit of mischief," turned the hose on a horse who ran away, had acted outside the scope of his employment. The New Jersey court, as quoted in *Terrett*, stated:

> If the act of the defendant's son in throwing water upon the plaintiff's horse was not the result of his careless handling of the garden hose while sprinkling his father's lawn, but was deliberately done by him, purely out of a spirit of mischief, for the purpose of frightening the animal, the fact that he used the tool supplied to him for the doing of his father's work for the accomplishment of his own mischievous purpose did not make it an act within the scope of his

---

[6] The New Jersey Court of Errors and Appeals is now known as the New Jersey Supreme Court.

employment, and did not render the defendant liable for the injury resulting therefrom.

*Id.* at 94 (quoting *Evers*, 58 A. at 182).

Next, Metro cites *Corder v. Metropolitan Government of Nashville and Davidson County, Tennessee*, 852 S.W.2d 910 (Tenn. Ct. App. 1992). In *Corder*, an off-duty policy officer accidentally discharged his weapon, which he had been given permission to carry between work and home, while "teasing" his passenger. *Id.* at 914. This Court upheld the trial court's grant of summary judgment to the Metropolitan Government, finding that the officer was not acting within the scope of his employment despite the fact that he was wearing a badge and that he identified himself as a deputy at the scene. *Id.* Metro also contends that the case of *United States v. Taylor*, 236 F.2d 649 (6th Cir. 1956) supports its assertion that horseplay is outside the scope of an employee's employment. In *Taylor*, a United States Air Force lieutenant, disregarding his instructions to conduct specific training exercises in a ninety mile radius, flew more than three hundred miles to his hometown in Tennessee where he flew at an accelerated speed and at a very low altitude over the courthouse, crashing and injuring persons on the ground. *Id.* at 651-52. The Court, in determining whether the pilot's actions were within the scope of his employment such that the United States could be liable, stated:

> The fact that the Air Force personnel were acting in disobedience of their orders would not alone exculpate the government from liability under the law of Tennessee. The Tennessee courts have consistently held that failure to obey a rule as to how the master's business is to be performed does not of itself constitute a departure from the servant's scope of employment.

> Moreover the Tennessee Court of Appeals has recognized that an employee may remain within the scope of his employment so as to hold his employer liable for his tort even though he undertakes a personal project of his own, if it is undertaken in the general course of carrying out his employer's business.

*Id.* at 654 (internal citations omitted). However, the Court reasoned that by flying three hundred miles, the pilot "completely abandoned the business of his employer[,]" and that "[s]uch a geographical deviation alone would under Tennessee law clearly remove these employees from the scope of their employment." *Id.* (citations omitted). Furthermore, the Court found it "equally clear" that had "the pilot's conduct occurred within the authorized geographical area, it would not have been within the scope of his employment under Tennessee law[,]" *Id.* which holds that "'[e]xtraordinary, extreme, or prankish acts rarely can

be attributed to the master as means or methods of carrying out an ordinary employment." *Id.* (quoting *Terrett*, 105 S.W.2d at 94).

Finally, Metro cites *Morris v. Collis Foods, Inc.*, No. W2001-00918-COA-R3-CV, 2002 WL 1349514, at *1 (Tenn. Ct. App. June 19, 2002), in which this Court held that a waitress was acting outside the scope of her employment when she threw an object at an unruly patron. This Court noted that it often looked to the Restatement (Second) of Agency to determine whether an employee's actions were within the scope of employment. *Id.* at *3. The Restatement provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:
>
> (a) it is of the kind he is employed to perform;
>
> (b) it occurs substantially within the authorized time and space limits;
>
> (c) it is actuated, at least in part, by a purpose to serve the master; and
>
> (d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
>
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

*Id.* (quoting Restatement (Second) of Agency § 228, p.504 (1957)). The Court further relied upon the Restatement (Second) of Agency § 229, which states:

> (2) In determining whether or not the conduct although not authorized, is nevertheless so similar to or incidental to the conduct authorized as to be within the scope of employment, the following matters of fact are to be considered:
>
> (a) whether or not the act is one commonly done by such servants;
>
> (b) the time, place and purpose of the act;
>
> (c) the previous relations between the master and the servant;
>
> (d) the extent to which the business of the master is apportioned between different servants;
>
> (e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;
>
> (f) whether or not the master has reason to expect such an act will be done;
>
> (g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

*Id.* at *4 (quoting Restatement (Second) of Agency § 229, p.506 (1957)). Applying the above factors, this Court found that the employee's actions were not "incidental to authorized conduct" because the actions were not common to actions taken by other employees, the actions were personal in nature and showed no similarity to authorized actions, the object thrown was not furnished by her employer for that purpose, her employer had no reason to suspect she would behave in such a manner, and the employee was convicted of assault for her actions. ***Id.***

In support of his claim that Mr. Archey was acting within the scope of his employment, Mr. Hughes cites Tennessee Code Annotated section 55-10-331, which provides that when an injury is caused by the operation of a motor vehicle owned by the employer, proof of ownership by, and registration to the owner, constitute *prima facie*[7] evidence that the vehicle was being operated for the employer's benefit within the scope of the employee's employment. ***Russell v. City of Memphis***, 106 S.W.3d 655, 657 (Tenn. Ct. App. 2002).

Mr. Hughes also cites two cases which he claims demonstrate that the courts of this state have expanded the scope of employment since the *Terrett* case to include horseplay. First, he cites *Ransom v. H.G. Hill Co.*, 326 S.W.2d 659, 379 (Tenn. 1959), a worker's compensation case,[8] in which an employee, who was "standing around waiting to be assigned some work" "grabbed [another employee] by the seat of the britches" causing the other employee to fall, was acting within the scope of his employment. The Court cited Section

_____

[7] The *prima facie* case can be overcome by uncontradicted evidence from a credible witness. ***Russell***, 106 S.W.3d at 657.

[8] We note that the Tennessee Workers' Compensation Act is to be " liberally construed in favor of compensation and any doubts should be resolved in the employee's favor[,]" ***Wait v. Travelers Indem. Co. of Illinois***, 240 S.W.3d 220, 224 (Tenn. 2007) (citing *Knox v. Batson*, 399 S.W.2d 765, 772 (Tenn. 1966)), while the GTLA's waiver of immunity is "narrowly defined in its scope." ***Doyle v. Frost***, 49 S.W.3d 853, 858 (Tenn. 2001).

23.61, Volume 1, Larson on Compensation, as follows:

'The essence of the controversy in horseplay cases is the ambiguous nature of claimant's own conduct, which may or may not be called a departure from his employer's business. The 'arising out of employment' issue, once you have concluded that the horseplay activity itself was no departure from the employment, can usually be disposed of. In the great majority of the cases, there is some distinct contribution to the injury by the environment, in the form of air hoses or other instrumentalities; and even when this is not true, the 'arising' test can be simply met by the argument that if the activity itself qualifies as part of that activity, then the harm arises out of the employment of which that activity was a part.'

'If an employee momentarily walks over to a co-employee to engage in a friendly word or two, this would nowadays be called an insubstantial deviation. If he accompanies this friendly word with a playful jab in the ribs, surely it cannot be said that an entirely new set of principles has come into play. The incident remains a simple human diversion subject to the same tests of extent of departure from employment as if the playful gesture had been omitted.

*Id.* at 662-63 (quoting Section 23.61, Larson on Compensation) (internal citations omitted). The Court noted that "practicable jokesters" are not always acting within the scope of their employment, "but so long as the things done are the natural and normal thing of the type the employees who are kept there . . . it seems to us that they clearly have not left their employment." *Id.* at 663. Mr. Hughes further cites the unpublished Tennessee Supreme Court case of *Rhea v. Shoney's South*, 1986 WL 13706, at *1 (Tenn. 1986) wherein the Court found that the plaintiff's dancing, when he slipped and was injured, was not "willful misconduct" such that the plaintiff was precluded from recovering worker's compensation benefits.

As we noted above, the trial court found that when the incident occurred, Mr. Archey was acting within the scope of his employment for Metro. "Generally, whether an employee is acting within the scope of his or her employment is a question of fact." ***Tenn. Farmers Mut. Ins. Co. v. Am. Mut. Liab. Ins. Co.***, 840 S.W.2d 933, 937 (Tenn. Ct. App. 1992) (citing *Craig v. Gentry*, 792 S.W.2d 77, 80 (Tenn. Ct. App. 1990)). "However, it becomes a question of law when the facts are undisputed and cannot support conflicting conclusions." *Id.* (citations omitted). In the instant case, the parties do not agree as to whether Mr. Archey was "horseplaying" during the incident or whether his front end loader merely "bottomed

-14-

out" due to the dip in the access roadway. Furthermore, even if the parties were to agree that Mr. Archey was involved in horseplay, they disagree as to whether horseplay is included within the scope of employment. Accordingly, the trial court's finding that Mr. Archey was acting within the scope of his employment is a finding of fact entitled to a presumption of correctness. ***See id.***

At the outset, we acknowledge that the circumstances of the instant case present a closer question than the facts of those cases relied upon the parties. After a close consideration of the circumstances and the above-cited authorities, we find that the evidence presented does not preponderate against the trial court's finding that Mr. Archey was acting within the scope of his employment when Mr. Hughes was injured. At trial, Mr. Archey acknowledged that "safety is something th[at] th[ey] preach out at public works[,]" that he had been given instructions regarding the safe operation of heavy machinery near pedestrians, and that he knew better than to "mess around with heavy equipment around pedestrians[.]" However, that Mr. Archey had departed from Metro's rules does not automatically remove his conduct from the scope of his employment, *see Taylor*, 236 F.2d at 654, nor does a finding of horseplay. Mr. Archey was returning the front end loader as part of his employment with Metro, his primary motivation in operating the front end loader was serving Metro, he was traveling the route prescribed by Metro, and the front end loader had been furnished by Metro. Although Mr. Archey's conduct in causing the loud noise which frightened Mr. Hughes was "a personal project of his own[,]" we nonetheless find that Mr. Archey's conduct occurred in the "general course of carrying out his employer's business" so as to be within the scope of his employment. ***See id.***

### C. *Negligent v. Intentional Conduct*

Having found that Mr. Archey was acting within the scope of his employment, we now consider whether Mr. Archey's actions in operating the front end loader constitute negligent or intentional conduct. The trial court found that "Mr. Archey's actions constitute negligence, not an intentional tort." However, on appeal, Metro argues that because Mr. Archey intended to scare Mr. Hughes, his actions make out the intentional tort of assault for which Metro is not liable.

We first address Metro's contention that the trial court erred in holding that Tennessee Code Annotated section 29-20-202 does not require negligent conduct. From the bench, the trial court stated:

> [Tennessee Code Annotated 29-20-]202 is plain. It says operation of a motor
> vehicle or equipment. And if Senator Haynes' colleagues up on the hill had

-15-

wanted to change that and say except if somebody is operating it intentionally or recklessly or grossly negligent or wanted to add[] any type of exception to it, I presume that they would have done so. They intended to cover every operation of motor vehicles and equipment by government employees as being -- having immunity removed.

This statement evidences the trial court's misinterpretation of the statutory language. As we noted above, Tennessee Code Annotated section 29-20-202 removes governmental immunity "for injuries resulting from the *negligent* operation by any employee of a motor vehicle or other equipment while in the scope of employment." (emphasis added). Thus, if we find Mr. Archey's conduct was intentional, Metro's immunity is not removed pursuant to section 29-20-202.

Tennessee Code Annotated section 29-20-205's "intentional tort exception" specifically preserves governmental immunity for certain specifically enumerated intentional torts. **Pendleton**, 2005 WL 2138240, at *2. Because assault and battery claims are not specifically enumerated within the intentional tort exception, governmental entities *may* be liable when governmental employees commit an assault or battery. **Id.** at *3. However, this Court has held that the "GTLA does not allow plaintiffs to hold governmental entities vicariously liable for intentional torts not exempted under section 29-20-205(2), but rather requires a *direct showing* [*of*] *negligence* on the part of the governmental entity." **Id.** (emphasis added). Thus, to remove a government's immunity for an unenumerated intentional tort by its employee, a threshold showing of negligence on the part of the governmental entity must be shown. In the instant case, the trial court found that "[Mr. Hughes] failed to prove negligent supervision," and this finding is not challenged on appeal. Accordingly, if we find Mr. Archey's conduct was intentional, Metro's immunity is not removed pursuant to section 29-20-205.

As we stated above, the trial court found that Mr. Archey's conduct was negligent. From the bench, the trial court stated:

I find that [Mr. Archey's] actions were -- I guess the term would be, in my opinion, sort of aggravated negligence in a way. And I don't think it's that important. I think the proof shows that Mr. Archey was clearly negligent in the lack of use of ordinary care in the driving of the front end loader as he approached this area, the parking lot. As pointed out . . . it was closing time, Friday afternoon. He had worked there. He knew everybody was getting off

-16-

work. People were going to be going to their cars at that time. This wasn't a situation where it was one o'clock in the afternoon or ten o'clock in the morning where he might not have thought anybody was out there and he had to run back in real quick to fill up and go back out. He's coming in to shut down for the end of the day as well. He knew other people were out there, and actually saw three individuals, one at the far end and then two people much closer to him. He owed a duty of ordinary care to drive that front end loader as he approached those individuals. He did not exercise ordinary care.

He was aware of the dip. And I find there was a dip there. I think the proof shows there is some imperfection in the roadway at that gate area, but also he was aware of it. He knew it was there. He passed over it. Even though he had only been driving that particular route for about two weeks, maybe, he said he knew it was there. Nonetheless, he approached it without slowing down. And I find that the testimony that the engine was revving up is more persuasive than the engine brake sound[.]

. . . . But where Mr. Hughes and Mr. Goad were walking, there is no reason he couldn't have pulled over further to the left. And he didn't do that.

Instead, it seems clear, and I conclude, that Mr. Archey didn't slow down. It was foreseeable to him that this front end loader was going to bounce as soon as he came over that dip area, that pot hole area at the rate of speed he was travel[]ing. And he knew and it was foreseeable that that bucket was going to hit the ground and make a very loud noise.

. . . . And it's clear to me that Mr. Archey intended to carelessly drive this vehicle over that little bump, making the noise and commotion that was going to be associated with it.

The fact that he intended to drive the vehicle in a negligent or careless manner does not morph this into the classic intentional tort of assault. And it conceivably could be argued that it's reckless, but I don't think that recklessness is included by this statute.

. . . .

-17-

He intended to do this. And I think I know what's going on. It's a Friday afternoon, and from Mr. Archey's testimony, I get a taste of his personality, and they use the term horseplay and cutting up as he was coming through there and rev up his front end loader and bounce it through this little spot and make a lot of noise. . . . And it is foreseeable that by causing that type of noise and commotion, that somebody might be startled, frightened, shocked, whatever, trip, and be hurt. For that reason, the negligent person is responsible for it.

"It is well settled in Tennessee that assault and battery constitute intentional torts, not acts of negligence." *Pendleton*, 2005 WL 2138240, at *1 n.1 (citing *Limbaugh v. Coffee County Med. Ctr.*, 59 S.W.3d 73, 84 (Tenn. 2001)). What is not so clear is whether the requisite intent for assault is the intent to *frighten* or the intent to *harm*. On appeal, Metro claims that because Mr. Archey intended to frighten Mr. Hughes, that his actions constitute assault rather than negligence. However, Mr. Hughes claims that intent to frighten is insufficient to recover under an assault theory, and that an intent to harm must be shown.

Both parties have cited Tennessee authorities to support their respective positions. After consideration of each, we agree with Mr. Hughes that under Tennessee law, the intentional tort of assault requires a showing of intent to harm rather than mere intent to frighten. In *Huffman v. State*, 292 S.W.2d 738, 742 (Tenn. 1956), *overruled on other grounds* by *State v. Irvin*, 603 S.W.2d 121 (Tenn. 1980), our Supreme Court stated:

> An assault is rather clearly defined in 6 C.J.S., Assault and Battery, § 60, at page 915 as:

> An assault may consist of any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person.

This definition was cited in *Johnson v. Cantrell*, No. 01A01-9712-CV-00690, 1999 WL 5083, at *3 (Tenn. Ct. App. W.S. Jan. 7, 1999), wherein this Court stated that "[u]nder this definition, a defendant is not subject to liability for assault unless he or she commits an intentional act creating a reasonable apprehension of imminent physical harm on the part of the plaintiff." Although this Court's statement, at first glance, appears to lend support to Metro's contention that an intent to frighten is sufficient, we interpret the statement to clarify the preceding definition: The tortfeasor must intend harm, however, the plaintiff may recover if he is injured *or* if he reasonably apprehends physical harm. A similar interpretation was made by the United States District Court for the Middle District of Tennessee:

-18-

At common law, assault was defined as "any act tending to do corporal injury to another, accompanied with such circumstances as denote at the time an intention, coupled with the present ability, of using actual violence against the person." [*Vafaie v. Owens*, 1996 WL 502133 at *3 (Tenn. Ct. App. 1996) (citing *Huffman*[, 292 S.W.2d at 742].

. . . .

In Tennessee, it is elementary that there cannot be an assault and battery without a willful injury of the person upon whom the wrong is inflicted. *Moffitt v. United States*, 430 F.Supp. 34, 37 (E.D. Tenn. 1976). The word "willful" means nothing more than intentional. *Id.* In other words, an indispensable element of the evidence necessary to support an assault or battery cause of action is that the striking is willful and intentional. *Id.*

*Thompson v. Williamson County, Tennessee*, 965 F.Supp. 1026, 1037-38 (M.D. Tenn. 1997).

In support of its contention that intent to harm is not an element of assault, Metro cites W. Page Keeton et al., Prosser and Keeton on the Law of Torts, § 8, at 33, 36-37 (5th ed. 1984), which states that "[t]he intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interest of another in a way that the law forbids." Further, Metro cites the Restatement (Second) of Torts § 21 which states that an actor is subject to liability for an "assault" if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such contact, and (b) the other is thereby put in such imminent apprehension." Next, Metro cites *Harrell v. State*, 493 S.W.2d 664, 670 (Tenn. Crim. App. 1979), in which the Court found that "at common law, an essential element of assault is an intent either to frighten or harm." Finally, Metro points out that the Tennessee Pattern Jury Instructions define the intentional tort of assault as follows:

An assault consists of two elements:

1. An intentional attempt or the unmistakable appearance of an intentional attempt to do harm to another person; and

2. The present ability or the unmistakable appearance of the present ability to do that harm.

**T.P.I.–Civil 8.01 (2009)**.[9]

_____

[9] The jury instruction cites *Huffman*, 292 S.W.2d 738 as its authority.

We find the authority cited by Mr. Hughes more clearly reflects the elements of a civil claim of assault in this state. "[N]othing in Tennessee law . . . indicates that Tennessee has replaced its common law definition of assault with the elements set forth in the Restatement." *Chidester v. Thomas*, No. 02-2556 MA/A, 2006 WL 1459578, at *5 (W.D. Tenn. 2006) (citing the *Huffman* definition of assault, and finding that although the defendant argued that he did not intend to harm the plaintiff, a genuine issue of material fact existed as to whether the defendant acted with the "necessary intent.").

Neither Mr. Hughes' amended complaint, nor Metro's cross-claim, alleged that Mr. Archey intended to harm Mr. Hughes. In fact, the trial court stated that "everybody agrees that Mr. Archey was not out there that day trying to run down Mr. Hughes and intentionally hurt him[,]" and no evidence has been presented to suggest an intent to harm. Accordingly, because we find that a civil action for assault requires an intent to harm, and no such intent has been shown, we find that Mr. Archey's conduct did not constitute the intentional tort of assault, and we affirm the trial court's finding of negligence.

## V. CONCLUSION

Because we find that Mr. Archey was acting within the scope of his employment when he negligently, rather than intentionally, injured Mr. Hughes, we affirm the trial court's entry of judgment for Mr. Hughes against Metro, its dismissal of Mr. Hughes' claim against Mr. Archey, and its dismissal of Metro's cross-claim against Mr. Archey. We need not consider the issues raised by Mr. Archey regarding accord and satisfaction and the comparative fault of Mr. Hughes, as these issues are deemed pretermitted. Costs of this appeal are taxed to Appellant, the Metropolitan Government of Nashville and Davidson County, and its surety, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, P.J., W.S.