FILED
**Mar 21, 2024**
**08:27 AM(CT)**
**TENNESSEE**
**WORKERS' COMPENSATION**
**APPEALS BOARD**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Raymond Pridgen | ) Docket No.  2020-03-0904 |
| | ) |
| v. | ) State File No.  57394-2019 |
| | ) |
| Texas Roadhouse Holdings, LLC, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) Heard February 7, 2024, |
| Compensation Claims | ) in Knoxville |
| Pamela B. Johnson, Judge | ) |

---

### Affirmed and Certified as Final

---

In this appeal, the employer contends the trial court erred in denying its motion for summary judgment, in concluding that the employee's alleged injury was compensable, and in awarding the employee permanent total disability benefits. The employee, a restaurant worker, reported that while he was in a designated break area outside the restaurant waiting for his ride, an opossum ran from behind a dumpster and startled him, causing him to fall and sustain injuries to his shoulder and back. The employer moved for summary judgment, asserting that the employee's injury did not arise primarily out of or in the course and scope of his employment. Following a compensation hearing, the trial court denied the employer's motion and concluded that, based on the totality of the evidence and relevant precedent, the employee's injuries arose out of and in the course and scope of his employment. The court also concluded, based in part on expert vocational testimony, that the employee was permanently and totally disabled as a result of the accident. The employer has appealed. After careful consideration of the record and the arguments of counsel, we affirm the trial court's order and certify it as final.

Judge Pele I. Godkin delivered the opinion of the Appeals Board in which Presiding Judge Timothy W. Conner and Judge Meredith B. Weaver joined.

Gregory H. Fuller and Tiffany B. Sherrill, Knoxville, Tennessee, for the employer-appellant, Texas Roadhouse Holdings, LLC

Peter Frech, Nashville, Tennessee, for the employee-appellee, Raymond Pridgen

## Factual and Procedural Background

On July 22, 2019, sometime after 11:00 p.m., Raymond Pridgen ("Employee"), who worked in the kitchen of a restaurant owned by Texas Roadhouse Holdings, LLC ("Employer"), went to a designated smoking area behind the restaurant to wait for his ride home. While Employee waited, an opossum ran out from behind a dumpster and startled Employee. As a result, Employee fell and reported suffering pain in his right shoulder and back. A co-worker, Justin Massey, stated that he had clocked out at 11:14 p.m. and was with Employee when the incident occurred. Employee reported the incident to Employer's kitchen manager, Janie Lay, immediately after it occurred. Ms. Lay indicated that Employee had clocked out at 11:00 p.m. and fell in the dock area after he had finished his shift.[1] She completed a First Report of Work Injury based on surveillance footage that showed the injury occurred at 11:40 p.m.[2]

Employee testified that, when he was hired, he informed Employer he did not have a driver's license and would need to arrange alternative transportation to and from work. It was common for one of Employee's relatives to drop him off at work and pick him up after his shift. In addition, employees were allowed to smoke in a designated area behind the restaurant, and employees would often wait for rides in that location as well. The designated smoking area was located near some dumpsters and grease barrels. Mr. Massey testified that opossums and other small animals were often seen near the dumpsters and grease barrels.

Employer accepted the claim as compensable and provided a panel of physicians, from which Employee selected Dr. Matthew Rappe. An MRI revealed a "massive" rotator cuff tear, and Dr. Rappe performed surgery in October 2019. On June 1, 2020, Dr. Rappe placed Employee at maximum medical improvement and assigned a three percent impairment rating with no permanent restrictions.

Employee testified that although he tried to return to work at another restaurant, he was unable to perform his job duties due to shoulder pain. In July 2020, he was seen again by Dr. Rappe and reported difficulty with reaching and lifting. A subsequent MRI revealed a retear of the rotator cuff, and Dr. Rappe performed a second surgery in September 2020. In July 2021, Employee again reported weakness with overhead lifting, and a third MRI revealed another retear of his rotator cuff. Following discussion of possible revision surgery, Employee and Dr. Rappe agreed to proceed with conservative treatment instead. Eventually, Dr. Rappe placed Employee at maximum medical improvement on February 25, 2022, revised his permanent medical impairment rating to

---

[1] Neither Employee nor Ms. Lay could remember if Employee clocked himself out or if Ms. Lay clocked him out after the timekeeping program Employer used completed an automated report.

[2] Employer initially accepted the claim as compensable but later elected to deny the claim. By the time the denial decision had been made, the surveillance video was no longer available.

seven percent, and assigned permanent restrictions of no overhead lifting or lifting more than five pounds with his right arm.

Employee was also seen by Dr. David Hovis for an employer's examination in December 2021. Dr. Hovis assigned a six percent impairment rating and provided permanent restrictions of no overhead work or lifting over ten pounds. Dr. Hovis noted that a reverse shoulder replacement could improve Employee's symptoms but stated that, even with such a surgery, Employee would have permanent restrictions "with an unlikely return to productive work." The parties elected to seek another evaluation from a physician on the Bureau's Medical Impairment Rating Registry ("MIRR").[3] Dr. Patrick Bolt, the MIRR physician, also assigned a seven percent impairment rating.

Employee filed a petition for benefit determination on July 28, 2020, in an effort to obtain his wage records from Employer.[4] On May 11, 2022, Employer filed a petition for settlement approval only, but the case did not settle. Finally, on June 24, 2022, Employee filed another petition for benefit determination seeking mediation and, if mediation proved unsuccessful, a trial. A dispute certification notice ("DCN") was issued on August 18, 2022, listing the injured body parts as the right shoulder and back and identifying temporary and permanent disability benefits as the disputed issues. Employer also raised as defenses Employee's refusal to accept a modified duty position and a possible intervening event. It also raised as a disputed issue the extent of Employee's permanent disability. Following a post-discovery mediation, a final DCN was issued in May 2023 identifying the injured body part as the back and listing as disputed issues compensability and permanent and temporary disability benefits. Employer also identified causation, whether the injury occurred in the course and scope of employment, and Employee's alleged refusal to accept modified work as defenses. Employer filed a motion for summary judgment on June 20, 2023, and the court issued a notice that it would hear Employer's motion on August 9, 2023, the same date as the compensation hearing.

At trial, Employee, Mr. Massey, Ms. Lay, and the parties' vocational experts testified live, while expert medical proof was submitted via deposition transcripts. During his direct examination, Employee testified that, after the work incident, he attempted to return to work with Employer but experienced swelling in his right hand and arm and, following his first surgery, was unable to raise his right arm overhead. Upon reaching maximum medical improvement, Employee testified that he contacted Ms. Lay about returning to work. He testified that Employer told him they would contact him if a job became available and, despite following up, he never heard back from Employer. Employee stated he attempted to work at other restaurants but was unable to lift his right

---

[3] *See* Tenn. Code Ann. § 50-6-204(d)(4).

[4] The outcome of that petition is unclear, as there is no subsequent documentation in the technical record concerning that dispute.

arm, could only work limited hours, and eventually had to quit because the work became too painful.

Employee testified that he is fifty years old and obtained his GED after quitting high school in the tenth grade. He attended business school for one semester but testified he cannot use a computer or type efficiently. Employee worked in the construction industry before transitioning to the restaurant industry. As a restaurant worker, his duties included ordering and stocking supplies, preparing food, and cleaning, with lifting requirements up to sixty pounds. He claimed he is unable to return to that type of work. He also testified that he now experiences chronic right arm pain, often wears a sling, and utilizes a Tens unit for pain. He cannot move his arm above his chest or behind his back and has trouble completing daily activities. He also testified to worsening peripheral neuropathy caused by his diabetes, which makes it difficult to stand for more than an hour. Employee also reported suffering a stroke following the work injury, which necessitates the use of a cane to walk. Finally, he testified he still does not have a license and only drives out of necessity on occasion.

During her testimony, Ms. Lay agreed that Employee had asked to return to work. However, she testified that he told her he had restrictions that prevented him from using his right arm, but he did not provide documentation of those restrictions. She also testified that she may have been able to modify a job in order to accommodate his restrictions, but there was no attempt to bring Employee back in a modified position.

Vocational experts Dana Stoller and Michael Galloway testified for Employee and Employer, respectively. Ms. Stoller described Employee's pre-injury work as falling in the medium-to-heavy physical demand category. She noted that Employee had "no limitations that precluded him from the ability to maintain suitable and gainful employment prior to this work injury" and that, at the time of the work incident, Employee was required to lift and carry up to 100 pounds, stand throughout his shift, frequently reach above his shoulders, and constantly handle items while working in a fast-paced environment. Ms. Stoller relied on Dr. Rappe's statements assigning Employee permanent restrictions of no lifting greater than five pounds on the right side and no overhead work. She concluded Employee does not possess transferrable job skills and is not able to perform his activities of daily living without assistance. She noted that Employee had attempted to return to work but was physically unable to perform his job duties. On cross-examination, Ms. Stoller agreed that her evaluation took place over the phone and that she was not aware he used a cane or had issues with his back. Ultimately, she determined that he sustained a significant loss of access to the local labor market, testifying that "there's no work that this individual can perform in the open economy."

Mr. Galloway testified to a similar understanding of Employee's job history. He noted that Employee had attempted to return to work post-injury on at least two occasions but was unable to perform his job. Mr. Galloway was aware of Employee's pre-existing

medical issues, including chronic low back pain, neuropathy, sleep apnea, diabetes, and a previous right knee injury. Mr. Galloway believed that, following his work injury, Employee was able to complete personal hygiene tasks and meal preparation, but he needed his son's assistance for other tasks and relied on his left arm in certain circumstances. Mr. Galloway concluded that Employee retained a 90% vocational disability following the work injury, based on Dr. Rappe's and Dr. Hovis's permanent restrictions, his age, educational and vocational profile, and the labor market. When also considering Employee's non-work-related medical conditions and self-reported limitations, Mr. Galloway opined that Employee was likely unable to work.

In its motion for summary judgment, which the court heard immediately prior to conducting the compensation hearing, Employer asserted that Employee's injury did not arise out of or in the course and scope of his employment. In support of its motion, Employer argued that Employee was not working or performing duties on behalf of Employer at the time of the incident but was simply present at the location, waiting for his son to pick him up. Employer further argued that the incident happened at 11:40 pm, well after Employee's shift had ended. In response, Employee argued he was waiting for his son to pick him up from work, which was an activity incident to his employment and in which Employer had acquiesced, given Employee's inability to drive himself. Further, Employee asserted he could not remember whether he had clocked out at the time of the injury and disputed the time of the incident itself. The court took the motion under advisement at trial but later denied Employer's motion for summary judgment in its order, concluding that the parties disputed certain material facts regarding the time Employee's shift had ended and the time of the incident, which would require it to assess witness credibility and weigh evidence. The court further determined that Employer failed to negate an essential element of Employee's claim or demonstrate that his evidence was insufficient to establish an entitlement to benefits.

The court then turned to the evidence presented during trial, first considering the threshold issue of whether Employee's injury arose primarily out of and in the course and scope of his employment. In considering this issue, the Court focused on both the premises liability rule and the personal comfort doctrine.[5] In doing so, the court looked at the evidence offered at trial establishing that Employee was in a designated area of Employer's premises waiting for his ride, which was permitted by Employer, when the incident occurred. There is no dispute as to the sequence of events resulting in Employee's injury or that Employee was engaged in activities of which Employer was aware and in which Employer had acquiesced.

---

[5] Although the court used the term "premises liability" in its order, its analysis was based on a common doctrine applied in workers' compensation cases known as the "premises rule." The premises rule is used to determine whether the worker was injured on an employer's premises, which encompasses not only the area where an employee performs work activities, but any area within the boundaries of the employer's premises, including parking areas and access roads. *See, e.g.*, *Durant v. Saturn Corp.*, No. M2003-00566-WC-R3-CV, 2004 Tenn. LEXIS 353, at *2 (Tenn. Workers' Comp. App. Panel Apr. 30, 2004).

The trial court, relying on *Rowe v. Mitsubishi Motors North America, Inc.*, No. 2020-06-0646, 2021 TN Wrk. Comp. App. Bd. LEXIS 15 (Tenn. Workers' Comp. App. Bd. May 28, 2021), noted that the course of employment "includes not only the time for which the employee is actually paid but also a reasonable time during which the employee is necessarily on the employer's premises while passing to or from the place where the work is actually done." *Id.* at *8. The court also relied on *Jacobs v. Bridgestone Americas Tires Operations, LLC*, No. 2017-05-0132, 2018 TN Wrk. Comp. App. Bd. LEXIS 4, at *11-15 (Tenn. Workers' Comp. App. Bd. Feb. 7, 2018), for the general proposition that, under the personal comfort doctrine, injuries suffered by employees while on approved or authorized breaks are deemed to have arisen out of and occurred in the course and scope of employment.

Next, Employer argued that, because Employee had been clocked out forty minutes prior to the incident, the personal comfort doctrine should not apply and his mere presence on Employer's premises was not determinative. It argued he was simply socializing with another co-worker well after his shift had ended when the injury occurred and, as a result, the injury neither arose out of the employment nor occurred in the course and scope of the employment. In finding that Employee's injury arose primarily out of and in the course and scope of his employment, the trial court noted it was "not persuaded that [Employee] in fact clocked out at 11:00 p.m. or that the incident occurred forty minutes after he clocked out." Further, the court determined that even if the incident occurred forty minutes after Employee had clocked out, this was a reasonable time for him to have remained on Employer's premises given the need for him to wait for a ride, and this fact was not sufficient to bar his claim for benefits.

In determining the extent of Employee's medical impairment, the trial court weighed the medical opinions offered by Dr. Rappe, the authorized treating physician; Dr. Bolt, the MIRR physician; and Dr. Hovis, the physician Employer retained to examine Employee. Although Dr. Rappe first assigned a 3% impairment rating, he later revised it to 7% after recurrent tears and a revision surgery. His opinion concerning the degree of impairment carried a presumption of correctness pursuant to Tennessee Code Annotated section 50-6-204(k)(7). Dr. Bolt, the MIRR physician, provided the same impairment rating, and the court noted that the presumption applicable to his impairment opinion may only be rebutted by clear and convincing evidence pursuant to Tennessee Code Annotated section 50-6-204(d)(4). Dr. Hovis assigned a 6% impairment rating, and the trial court concluded his opinion failed to rebut the presumption of correctness afforded the opinions of Drs. Rappe and Bolt. In addition, Dr. Hovis had conceded that the opinions of the other physicians were reasonable and did not explain why his was more accurate.

Finally, the court considered the extent of Employee's permanent disability. In doing so, it considered Employee's medical impairment, job skills, education, age, training, and job opportunities and the expert vocational opinions. The court also relied

on the expert medical proof submitted by the parties and Employee's testimony regarding his condition and ability to return to work. In support of its determination that Employee was permanently and totally disabled, the court noted that Employee testified that he was unable to return to any type of gainful employment, was 50 years old, had obtained his GED, and had a work history of construction and restaurant industry work, which included medium-to-heavy physical demands. The court accepted testimony that established Employee retained a 7% impairment and had permanent restrictions of no lifting greater than five to ten pounds with his right arm and no overhead work. The court also concluded that Employee's permanent restrictions limited him to sedentary or light work in unskilled jobs. Ultimately, the court found the preponderance of the evidence established that Employee was permanently and totally disabled and awarded him benefits pursuant to Tennessee Code Annotated section 50-6-207(4)(A)(i). Employer has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise. *See* Tenn. Code Ann. § 50-6-239(c)(7) (2023). When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to factual findings made by the trial court. *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009). However, "[n]o similar deference need be afforded the trial court's findings based upon documentary evidence." *Goodman v. Schwarz Paper Co.*, No. W2016-02594-SC-R3-WC, 2018 Tenn. LEXIS 8, at *6 (Tenn. Workers' Comp. Panel Jan. 18, 2018). Similarly, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions. *See Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013). We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer. Tenn. Code Ann. § 50-6-116 (2023).

## Analysis

Employer raises four issues in its notice of appeal: (1) whether the trial court erred in finding Employee's injury occurred during the course and scope of and arose primarily out of his employment; (2) whether Employee was entitled to benefits for his shoulder injury despite not identifying the shoulder as an injured body part in his petitions for benefit determination or post-discovery dispute certification notice; (3) whether the court should have relied on Dr. Rappe's original 3% impairment rating; and (4) whether the trial court erred in determining Employee was permanently and totally disabled as a result of his work injury.

7

First, Employer asserts the trial court erred in finding that Employee's injury occurred in the course and scope of his employment. Specifically, it maintains that Employee was "undisputedly not working at the time of the injury" and that he "was not in the process of leaving the Employer when the injury occurred . . . [and] was unsure what it was that he was doing." Instead, Employer contends Employee was simply "hanging out" instead of doing anything to benefit Employer.

The requirements that an injury must "arise out of" and occur "in the course of" employment are not synonymous, although both elements exist to ensure a work connection to the injury for which the employee seeks benefits. *Wait v. Travelers Indem. Co. of Illinois*, 240 S.W.3d 225 (Tenn. 2007). The term "in the course of" refers to the time, place, and circumstances of the injury, while "arising out of" refers to causation. *Cloyd v. Hartco Flooring Co.*, 274 S.W.3d 643 (Tenn. 2008).

Employer argues that the facts of this case are similar to *Higgins v. Big K Food Market & Liquors, Inc.*, No. 2014-01-0007, 2014 TN Wrk. Comp. App. Bd. LEXIS 3 (Tenn. Workers' Comp. App. Bd. Dec. 8, 2014). In *Higgins*, the employee was told to come to work in the morning to observe deliveries of certain products. *Id.* at *2. At approximately 11:00 a.m., when the deliveries were completed, the employee was told he could leave the employer's premises and return when his shift started at 6:00 p.m. *Id.* About two and a half hours later, the employee was still on the employer's premises when he allegedly suffered injuries. *Id.* at *2-3. The trial court denied benefits, and the employee appealed. *Id.* at *4. On appeal, the employee failed to file a transcript or statement of the evidence, so, consistent with established Tennessee law, we presumed the trial court's findings were supported by sufficient evidence and affirmed the trial court. *Id.* at *8-9. Notably, we did not reach the merits of the appeal, including whether the employee's presence at the employer's premises under these circumstances gave rise to a compensable injury.

The facts of this case are distinguishable from *Higgins*. Here, Employee was not asked to leave the premises and did not remain on the premises for over two hours after his shift ended prior to the work accident. In fact, Employer was aware that Employee usually waited for his son to pick him up at the end of his shift, and it was customary for employees to smoke or gather in the designated area behind the restaurant before, during, or after their shifts. In short, we conclude the result we reached in *Higgins* does not support Employer's position.

Instead, we find *Carter v. Volunteer Apparel, Inc.*, 833 S.W.2d 492 (Tenn. 1992) to be instructive. In *Carter*, the employee testified that she arrived at the break room provided by the employer around 7:10 a.m., approximately 20 minutes before her shift began and that it was customary for employees to gather in the break area prior to

clocking in and beginning work. *Id.* at 493. The trial court noted that the employer permitted employees to arrive early and drink coffee or smoke with fellow employees. *Id.* In addressing the merits of the case, the court stated that, pursuant to *Lollar v. Wal-Mart Stores, Inc.*, 767 S.W.2d 143 (Tenn. 1989), the determinative issue was whether the employee's injury occurred during a time when it was reasonable for the employee to be on the employer's premises. *Id.* The trial court had denied the claim, but, on appeal, the Tennessee Supreme Court reversed, stating:

> [T]he "course of employment" includes not only the time for which the employee is actually paid but also *a reasonable time* during which the employee is necessarily on the employer's premises while passing to or from the place where the work is actually done.
>
> We are of the opinion that injuries occurring on the premises at a reasonable time before work begins are "in the course of employment" even though this period is technically outside the regular hours of employment.

*Id.* at 494. The Court also noted as follows:

> Professor Larson lists four situations in which the course of employment goes beyond an employee's fixed hours of work: the time spent going and coming on the premises; an interval before working hours while waiting to begin or making preparations, *and a similar interval after hours*; regular unpaid rest periods taken on the premises; and unpaid lunch hours on the premises. It is obvious that "in the course of employment" for employees having a fixed time and place to work, embraces a reasonable interval before and after official working hours while the employee is on the premises *engaged in preparatory or incidental acts*.

*Id.* (citations omitted) (emphases added). The court then explained that "[w]hat constitutes a reasonable interval depends not only on the length of time involved but also on the circumstances occasioning the interval and the nature of the employee's activity." *Id.* In concluding the employee's injury occurred in the course and scope of the employment, the Court held that the employer had "acquiesced in the custom of its employees having pre-work breaks to the point that it became a regular incident of Plaintiff's employment." *Id.* at 496. In fact, the Court found it "significant that the employer did provide a break area for its employees and the employer acquiesced in and created the custom of pre-work breaks." *Id.* at 495.

We find the Supreme Court's rationale in *Carter* to be particularly relevant to the present case. Here, Employer acknowledged that its employees were allowed to smoke or wait for rides in the designated break area after work. Further, Employee testified that he waited for his son to pick him up after every work shift. Employer was aware that

9

Employee needed transportation to and from work because he did not have a driver's license. Thus, it was customary for Employee to wait for transportation after his shift had ended, and Employer had acquiesced in this practice. Although there is conflicting testimony as to whether Employee or someone else clocked him out, the outer limits of the contested timeframe between which Employee's shift ended and the incident occurred is no more than 40 minutes. Given Employer's acquiescence in allowing employees to stay on premises in the designated break area and wait for rides or mingle with co-workers without any stated limit, we conclude the evidence does not preponderate against the trial court's conclusion that this was a reasonable amount of time to remain on the premises and, therefore, Employee's injury occurred in the course and scope of the employment.[6]

*Shoulder Injury*

Employer next asserts that the trial court erred by awarding benefits for Employee's shoulder despite his failure to list that body part in either of the petitions he had filed or the final dispute certification notice. In support of its contention, Employer points to Tennessee Code Annotated section 50-6-239(b)(1), which provides, in relevant part,

> Unless permission has been granted by the workers' compensation judge, only issues that have been certified by a workers' compensation mediator within a dispute certification notice may be presented to the workers compensation judge for adjudication.

Employer contends that Employee's alleged shoulder injury was not a "certified" issue and, therefore, could only be heard by the trial court if the factors identified in Tennessee Code Annotated section 50-6-239(b)(2)(A)-(B) were satisfied. Conversely, Employee contends that Employer failed to file a notice of denial and voluntarily provided workers' compensation benefits for his shoulder injury, including authorizing a panel-selected physician and paying for two surgeries, physical therapy, and diagnostic tests, as well as paying temporary disability benefits. Employee also asserts that Employer did not indicate compensability was a disputed issue on the first dispute certification notice, with the only issue being the extent of Employee's impairment rating. Moreover, Employee noted that the petition for benefit determination filed by Employer for a settlement approval listed the shoulder as the injured body part.

At trial, Employer acknowledged that the statute says a mediator must certify a "disputed issue," not a particular body part. It also agreed it had filed a petition for settlement approval that listed the right shoulder as the injured body part. Employer

---

[6] As we have concluded the injury occurred within a "reasonable interval" of his shift ending as outlined by the *Carter* court, we do not need to analyze Employer's argument that the personal comfort doctrine does not apply to an incident occurring after a shift has ended.

provided no authority in support of its argument that a petition for benefit determination or a DCN must list every body part allegedly injured in a work incident. Thus, we find no merit in Employer's argument that the shoulder injury could not be properly considered by the trial court under the circumstances presented in this case.

## Evidence of Intervening Accident

Third, Employer asserts that Employee should be limited to the 3% impairment rating initially assigned by Dr. Rappe. Specifically, Employer contends that, after reaching maximum medical improvement on June 1, 2020, Employee suffered a retear in his shoulder while working for a new employer. Consequently, Employer argues Employee suffered a new and distinct injury, and it should not be responsible for any additional impairment. However, as noted by the trial court, Employer offered no evidence in support of its argument that Employee sustained an intervening injury that would relieve it of the obligation to pay benefits based on Dr. Rappe's revised impairment rating. Employee testified that he worked three to four days for an employer in June 2020 but could not lift his arm to perform his job duties. He later attempted to work another job at a different restaurant but was unable to work an entire shift due to pain from trying to prepare food. He denied any new injury or re-injury at either job. There was no evidence Employee reported a new injury to either subsequent employer. More importantly, Employer offered no medical evidence that Employee had suffered a new and distinct injury causing the re-tear in his shoulder. Thus, we conclude the evidence does not preponderate against the trial court's findings as to this issue.

## Permanent Total Disability

Finally, Employer argues the evidence does not support the trial court's finding that Employee is permanently and totally disabled as a result of his work injury. It points to Mr. Galloway's vocational assessment indicating there are multiple jobs Employee could perform based only on the permanent restrictions arising from his work injury. Further, Employer argues that the conditions that keep Employee from being able to obtain employment in the open labor market are not work-related, as it is undisputed that Employee suffers from several significant health conditions that limit his physical capabilities beyond the limitations caused by the work injury, as noted by Mr. Galloway.

An injured worker is permanently and totally disabled when "an injury not otherwise specifically provided for in this chapter totally incapacitates the employee from working at an occupation that brings the employee an income." Tenn. Code Ann. § 50-6-207(4)(B) (2023). As the Tennessee Supreme Court's Special Workers' Compensation Appeals Panel has observed, a trial court must

> consider[] a variety of factors in making this determination, so that its decision results from having a complete picture of the employee's ability to

11

obtain gainful employment post-injury. Such factors include the employee's skills, training, education, age, local job opportunities, and ability to work at the available jobs in his post-injury condition. Although vocational experts often present an assessment of these factors at trial, the employee's testimony concerning his ability or inability to return to gainful employment is competent testimony that should be considered. The extent of an injured employee's vocational disability is a question of fact for the trial court to determine from all of the evidence presented by the parties, including lay and expert testimony.

*Duignan v. Stowers Mach. Corp.*, No. E2018-01120-SC-R3-WC, 2019 Tenn. LEXIS 224, at *21-22 (Tenn. Workers' Comp. Panel June 19, 2019) (internal citations and quotation marks omitted).

In determining Employee's permanent vocational disability, the trial court considered Employee's age, job skills, education, training, the impairment ratings, and job opportunities in his community, as well as his testimony regarding his condition and ability or inability to return to work. The court noted he was 50 years old and had a GED. Although Employee testified to taking some college courses, it is unclear from the record whether any such classes are relevant to his current employability. Employee's previous work history consists of medium-to-heavy work, and he is now restricted from overhead lifting and lifting anything greater than 5 or 10 pounds with his right arm. The court noted that Ms. Stoller provided an opinion that Employee is permanently and totally disabled as a result of the work accident. Ms. Stoller testified that Employee has "very limited" basic computer skills and determined that "based upon the clear and convincing evidence, there's no work that [Employee] can perform in the open economy." She noted Employee was able to work prior to this work injury and had attempted to return to work several times post-injury, showing a "motivation to at least try to obtain some type of suitable and gainful employment." He was ultimately unsuccessful in his efforts to return to work in the restaurant industry. When asked about Mr. Galloway's vocational assessment of Employee, Ms. Stoller testified that she completed a labor market survey prior to trial and could not find any of the jobs he listed as available in the local labor market given Employee's permanent restrictions. Further, she noted that the types of positions Mr. Galloway listed, including cashiers, gate attendants, assemblers, and inspectors, often require the use of both arms in a repetitive manner, which Employee would be unable to do on a consistent basis.

Mr. Galloway testified that Employee would retain a 90% vocational disability even without considering any co-morbid conditions but would likely be unable to work when considering such non-work-related conditions. He agreed with Ms. Stoller that Employee could not return to his pre-injury occupation. On cross-examination, Mr. Galloway acknowledged that the possible job titles he had listed generally required the use of both arms and required repetitive movements and fine manipulation skills. He

admitted that if Employee "can't do repetitive activities and he can't pick up objects, he can't use his fingers, he can't reach outwards, that's significant in the world of work." Employee testified that although he does have preexisting medical conditions, he was able to work full-time prior to the work accident, and his inability to work only started after this injury. Moreover, he stated no permanent restrictions were assigned regarding any prior injuries or medical conditions. In addition, Employee's son testified that his father "worked his whole life" and if there was "any pain . . . he'd get over it and go into work."

We conclude the issue of whether the evidence supports a finding of permanent total disability is close. Employee's impairment rating and permanent physical restrictions arising from the work accident prevent Employee from returning to jobs classified in the medium or heavy physical demand categories, but they do not necessarily exclude jobs in the light or sedentary categories. Yet, it is undisputed that Employee made attempts to return to work, though unsuccessful, and his testimony regarding his own physical limitations is competent and relevant. *See Hubble v. Dyer Nursing Home*, 188 S.W.3d 525, 536 (Tenn. 2006). Although he has a GED and some college-level courses, his testimony regarding his limitations in typing and computer work was unrefuted. Ms. Stoller's testimony supports a finding of permanent total disability, and Mr. Galloway's testimony was somewhat equivocal given that he admitted Employee would have a hard time working if he cannot consistently use his arms and hands. In sum, we conclude the trial court appropriately considered the totality of the evidence, including Employee's testimony regarding his attempts to return to work and his physical limitations. Moreover, we accord deference to the trial court's assessment of the credibility of Employee's in-court testimony. As such, we are unable to conclude the evidence preponderates against the court's determination that Employee is permanently and totally disabled as a result of the work injury.

## Conclusion

For the foregoing reasons, we affirm the trial court's order and certify it as final. Costs on appeal are taxed to Employer.

13



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
# WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Raymond Pridgen | ) Docket No. 2020-03-0904 |
| | ) |
| v. | ) State File No. 57394-2019 |
| | ) |
| Texas Roadhouse Holdings, LLC, et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) Heard February 7, 2024 |
| Compensation Claims | ) in Knoxville |
| Pamela B. Johnson, Judge | ) |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 21st day of March, 2024.

| Name | Certified Mail | First Class Mail | Via Fax | Via Email | Sent to: |
|---|---|---|---|---|---|
| Tiffany B. Sherrill | | | | X | tbsherrill@mijs.com<br>ghfuller@mijs.com |
| Peter Frech | | | | X | pfrech@forthepeople.com<br>vjean@forthepeople.com |
| Pamela B. Johnson, Judge | | | | X | Via Electronic Mail |
| Kenneth M. Switzer, Chief Judge | | | | X | Via Electronic Mail |
| Penny Shrum, Clerk, Court of Workers' Compensation Claims | | | | X | penny.patterson-shrum@tn.gov |

*signature*

Olivia Yearwood
Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-1606
Electronic Mail: WCAppeals.Clerk@tn.gov